*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CHRISTINE CULLITON, Personal Representative of the Estate of COURTNEY CULLITON, | ) ) ) | Supreme Court No. S-17580 |
| | ) | Superior Court No. 1JU-17-00869 CI |
| Appellant, | ) ) | O P I N I O N |
| v. | ) ) | No. 7547 – July 30, 2021 |
| HOPE COMMUNITY RESOURCES, INC., | ) ) ) | |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Daniel Schally, Judge.

Appearances: Heather Gardner, Anchorage, for Appellant. Laura L. Farley, Farley & Graves, P.C., Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

BORGHESAN, Justice.

## I. INTRODUCTION

The estate of a severely disabled woman sued her in-home care providers for negligence in causing her death. The superior court granted summary judgment in favor of the providers, ruling that the estate was required to support its negligence claim

with expert testimony and had failed to present any. We hold that the estate is not required to present expert testimony to establish a breach of the duty of care because the estate's theory of fault is one of ordinary negligence that does not turn on the exercise of professional skill or judgment. The estate's theory of causation, by contrast, is complex and must be supported by the opinion of a medical expert. But the treating physician's deposition testimony is sufficient evidence of causation to survive summary judgment. We therefore reverse the superior court's decision and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

### A. Facts

This case arises out of the death of Courtney Culliton, a 31-year-old woman with severe developmental disabilities and chronic seizure disorder. Courtney began having seizures shortly after birth. She was diagnosed with Batten syndrome[1] and was considered terminal at 6 months. The frequency of her seizures was reduced by placing her in a "bubble" environment and putting her on a specific diet, which allowed her to live far longer than initially projected. Yet her cognitive and physical capacities were severely limited. Near the time of Courtney's death, her primary care physician, Myanandi Than, M.D., described Courtney as "terminally ill" with a poor prognosis.

---

[1] Batten syndrome, or Batten disease, is "cerebral sphingolipidosis, late juvenile type." *Batten Disease*, STEDMAN'S MEDICAL DICTIONARY (2014). Cerebral sphingolipidosis is "characterized by failure to thrive, hypertonicity, progressive spastic paralysis, loss of vision and occurrence of blindness, usually with macular degeneration and optic atrophy, convulsions, and mental deterioration; associated with abnormal storage of sphingomyelin and related lipids in the brain." *Cerebral Sphingolipidosis*, *id.*

### 1. Background information

Courtney received assisted-living services through the Medicaid Waiver Program, which allows eligible individuals to receive services at home.[2] Courtney's mother, Christine Culliton, contracted with Hope Community Resources, an in-home care provider certified under the waiver program, to receive services allowing Courtney to "reside and participate in her home safely with the appropriate level of monitoring and supervision to work on her skills of daily living, both in and out of the home." Hope supplied Courtney with in-home caretakers to perform many different tasks: monitoring Courtney; taking her vital signs; giving her medication; prompting her to get out of bed; entertaining her with toys and television; providing skincare and wound dressing; doing laundry and other chores; helping her walk, stretch, and exercise; and preparing and serving meals. Hope also paid Courtney's sister to provide services and "natural support."

### 2. The aspiration protocol

Courtney frequently suffered aspiration pneumonia, which occurs when a foreign substance is inhaled and enters the lungs, causing respiratory distress and bacterial infection. Because of this recurring condition, Courtney's food had to be pureed to the consistency of yogurt or pudding. Courtney was hospitalized for aspiration pneumonia on at least four occasions: once in 2011, again in 2013, and twice in 2014. According to a 2015 plan of care created for Courtney, 22 aspirations had been reported to her mother and sister in the prior year. The plan stated that Courtney's "aspirations range in severity and can often be difficult to detect[,] resulting in a lack of reporting by staff, and often times not being noticed until Courtney's health is adversely affected."

---

[2] *See* 7 Alaska Administrative Code (AAC) 130.200 (2013).

On August 12, 2015, Christine drafted an aspiration protocol with specific instructions for caretakers should Courtney choke on medication or food. The protocol instructed caretakers to clear the blockage and, "[i]f she [wa]s gasping for air or . . . not coughing out the blockage," to call 911 immediately. With any aspiration, caretakers were to notify Christine and document details of the event including what Courtney was eating or drinking, the time of the incident, and how she responded after clearing the blockage. Caretakers were also instructed to complete a critical incident report for the State's Division of Senior and Disabilities Services and to provide a copy to Hope and Christine. The protocol asserted that these steps were required "due to [Hope's] refusal to notify [Christine] so [she] can determine if medical intervention is necessary." Dr. Than endorsed the plan.

Hope received the protocol on or around August 18, 2015. In an email to Hope's medical director, one of Hope's officers acknowledged the protocol: "As a request for action from the parent has been expressed and we have a signed physician protocol in our possession staff will need to follow the protocol at this time and should be instructed in this protocol as soon as possible." In the same email chain, another of Hope's officers expressed reservations about the protocol and wrote "this circumstance warrants a sit down meeting" with other staff members.

### 3. Courtney died of aspiration pneumonia

According to a report produced by a caregiver for Hope, Courtney aspirated on August 25, 2015.[3] The parties dispute whether Hope informed Christine of this aspiration before Courtney's death. On August 29, Courtney had a 30-second grand mal

---

[3] This document was not shared with Christine at the time it was made; it was produced after Courtney's death.

seizure.[4] On September 2, Courtney had two more seizures (including a two-minute grand mal seizure). On September 4, Courtney had seven grand mal seizures, appeared to have a "head cold," and was in a poor mood. By September 6, Courtney had not urinated in over a day; Christine called an emergency room doctor and agreed to a plan of treatment that resulted in urination. However, after Courtney's condition failed to improve further she was admitted to the emergency room on September 10. Hospital records upon her admission indicate that she "has been a little more lethargic than usual the last couple of days and has not been making urine." A doctor noted "[p]robable aspiration pneumonia" and wrote that Christine was "very knowledgeable about [Courtney's] care and aggressive in terms of recommendations for treatment." The doctor indicated that he was "going to try to go along with mom as long as it makes sense."

Courtney's condition improved slightly on September 14, but Courtney aspirated again shortly thereafter. On September 16, Courtney began to display symptoms of pain. She was given painkillers, and the decision was made to transition

---

[4] A grand mal seizure is synonymous with a generalized tonic-clonic seizure, which is "a generalized seizure characterized by the sudden onset of tonic contraction of the muscles often associated with a cry or moan, and frequently resulting in a fall to the ground. The tonic phase of the seizure gradually gives way to clonic convulsive movements occurring bilaterally and synchronously before slowing and eventually stopping, followed by a variable period of unconsciousness and gradual recovery." *Grand Mal Seizure & Generalized Tonic-Clonic Seizure*, STEDMAN'S MEDICAL DICTIONARY (2014); *see generally Tonic*, *id.* ("In a state of continuous unremitting action; denoting especially a prolonged muscular contraction."); *Clonic & Clonus*, *id.* (characterized by "[a] form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession seen with, among other conditions, spasticity and some seizure disorders").

her to end-of-life care.  Courtney died later that day.  The hospital reported her official cause of death as "[b]ilateral aspiration pneumonitis, chronic recurrent seizures, [and] cerebral palsy."

### B.    Proceedings

Christine, representing herself,  filed a complaint against Hope alleging a single cause of action for "Medical Negligence" on behalf of Courtney's estate.  The estate alleged that Hope "breached its duty of care to Courtney Culliton in the following non-inclusive ways":  "[f]ailure to properly monitor her for aspirations"; "[f]ailing to advise others of those aspirations"; "[f]ailing to timely respond to changes in her medical condition"; [and] "[f]ailing to timely obtain higher level medical care."

Following discovery, Hope filed a motion for summary judgment arguing that because the estate's claim "raise[d] complex medical issues," it had to be proved with expert testimony.  Citing the deposition testimony of Courtney's treating physician, Hope argued that because Dr. Than "[could not] opine that it is more likely than not that the failure to report the August 25, 2015 suspected aspiration event to Christine caused Courtney's death" and the estate had no other expert witnesses, the complaint should be dismissed with prejudice.  The superior court heard oral argument and granted summary judgment in favor of Hope in a one-page order.  The superior court ruled that summary judgment was appropriate because of the estate's failure to provide expert testimony, incorporating by reference the arguments Hope made in its motion for summary judgment.  Final judgment in Hope's favor was entered.

The estate appeals the superior court's grant of summary judgment.

## III.    STANDARD OF REVIEW

"We review a grant of summary judgment de novo and will affirm the decision . . . [only] if there are no genuine issues of material fact and if the moving party

is entitled to judgment as a matter of law."[5] "Any dispute must not only be genuine and material, but arise from admissible evidence, such as affidavits recounting personal knowledge of specific facts."[6] All reasonable inferences are drawn in favor of the non-moving party.[7] "After the court makes reasonable inferences from the evidence in favor of the non-moving party, summary judgment is appropriate only when no reasonable person could discern a genuine factual dispute on a material issue."[8]

"Whether expert testimony is required to show a breach of a duty of care represents a question of law to which we apply our independent judgment."[9] We apply the same de novo standard of review to determine whether expert testimony is required to show causation in a negligence action.[10]

## IV. DISCUSSION

### A. The Estate Need Not Proffer Expert Testimony About The Standard Of Care.

The estate's theory of negligence in this case is clear. As Hope explains in its brief:

> [The estate] is *not* claiming that Hope was negligent in allowing Courtney to aspirate. Rather, [the estate's] theory is that had Hope promptly notified [Christine] about the

---

[5] *Parker v. Tomera*, 89 P.3d 761, 765 (Alaska 2004).

[6] *Kaiser v. Sakata*, 40 P.3d 800, 803 (Alaska 2002).

[7] *Id.*

[8] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014).

[9] *D.P. v. Wrangell Gen. Hosp.*, 5 P.3d 225, 228 (Alaska 2000).

[10] *See Punches v. McCarrey Glen Apartments, LLC*, 480 P.3d 612, 624-25 (Alaska 2021) (applying de novo review to question whether expert testimony was required to show causation); *Choi v. Anvil*, 32 P.3d 1, 3 & n.1 (Alaska 2001) (same).

August 25, 2015 suspected aspiration event, Courtney would not have died. [Emphasis in original.]

Hope argued below that the estate's claim is one of medical or professional malpractice that the estate must support with expert testimony, and the superior court, with little explanation, agreed. But nothing in the record suggests the alleged failure to notify Christine of the aspiration on August 25 stems from the exercise of professional skill or judgment. Hope internally acknowledged its obligation to notify Christine of suspected aspirations, and Courtney's caregiver on that day maintains she did in fact notify Christine. This is a claim of ordinary negligence that jurors can competently evaluate without the aid of an expert witness.

### 1. Expert testimony is not required to prove the standard of care in claims of ordinary negligence against professionals.

In medical malpractice actions "the jury ordinarily may find a breach of professional duty only on the basis of expert testimony," but expert testimony is not required "in non-technical situations where negligence is evident to lay people."[11] We recognized this distinction in *D.P. v. Wrangell General Hospital*, a case in which a patient hospitalized with schizophrenia and psychosis sued the hospital in negligence for failing to adequately protect her.[12] The doctor who hospitalized the plaintiff gave staff orders that the plaintiff "should stay in building, under observation/suicide precautions" because she was a danger to herself and others.[13] Yet a nurse lost track of the plaintiff, who left the building in a delusional state and had sex with a stranger.[14] The plaintiff

---

[11] *Wrangell Gen. Hosp.*, 5 P.3d at 228.

[12] *Id*. at 226-27.

[13] *Id*. at 226.

[14] *Id*.

filed suit alleging that the hospital failed to provide "reasonable and attentive care, including, but not limited to, adherence to physician's orders."[15] When the plaintiff did not provide expert testimony about the duty of care, the hospital moved for and received a directed verdict.[16]

We held that it was error to require the plaintiff to provide expert testimony about the medical standard of care in these circumstances.[17] The plaintiff's theory of negligence did not attack the defendants' exercise of professional judgment; she did not argue that defendants failed to appreciate her mental health problems or prescribe reasonable precautions.[18] Rather, the plaintiff's theory was one of "ordinary negligence": the staff failed to follow precautions ordered by the treating physician.[19] This theory did not raise "strict" medical malpractice issues because it did not involve "specialized care that requires the use of medical judgment."[20] Expert testimony was therefore unnecessary, as the question "[w]hether the hospital exercised reasonable care in supervising [the plaintiff] represent[ed] a factual question for the jury's resolution under an ordinary negligence framework."[21]

---

[15] *Id*. at 227.

[16] *Id*. at 228.

[17] *Id*.

[18] *Id*.

[19] *Id*. at 228-29.

[20] *Id*. at 229 & n.17.

[21] *Id*. at 229.

The rule that expert testimony is not required to establish ordinary negligence by professionals applies to claims against non-medical professionals as well.[22] For example, in *Clary Insurance Agency v. Doyle* we affirmed the trial court's rejection of a jury instruction stating that an insurance agent's failure to procure insurance may be judged solely on the basis of expert testimony.[23] In that case the insurance agent had failed to submit the client's premium to the worker's compensation insurance carrier and then did not inform the client that it was uninsured; the client lacked coverage when one of its employees was seriously injured.[24] Although we recognized that in some cases procuring insurance might require the use of professional judgment, we held the failure in that case was a matter of ordinary negligence because it did not involve professional judgment and it was obvious how the duty of care was breached.[25] We reasoned that "expert testimony is not required where 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' "[26]

In light of these decisions, whether Hope's employees are medical professionals is not dispositive of whether expert testimony is required. "Not every act of a professional requires an instruction on the professional standard of care"[27] or the

---

[22] *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 199-200 (Alaska 1980).

[23] *Id*. at 200.

[24] *Id*. at 197-98.

[25] *Id*. at 199-200.

[26] *Id*. at 200 (quoting *People v. Cole*, 301 P.2d 854, 856 (Cal. 1956)).

[27] *Id*.

testimony of an expert witness.  The key is whether the alleged negligence stems from the exercise of professional skill or judgment.[28]

> ### 2. The estate's theory of fault is one of ordinary negligence, so the estate need not establish the standard of care with expert testimony.

The estate argued below that the aspiration protocol gave Hope a duty to notify Christine of any aspirations and that Hope failed to perform that duty.  This theory of fault is essentially the same as the theory of fault in *D.P. v. Wrangell General Hospital* — failure to follow a physician's orders.[29]  Although Hope staff questioned the medical necessity of the aspiration protocol, their internal emails also suggest that they believed they had an obligation to follow it.  The record does not suggest, and Hope does not argue, that it purposely declined to follow the protocol as a result of its staff's professional judgment.  Instead its defense is the disputed factual assertion that the caretaker on duty *did* follow the protocol by notifying Christine of the aspiration on August 25.  Because Hope is not claiming that the alleged failure to notify Christine reflects the exercise of professional skill or judgment, expert testimony is not required to establish the duty of care or the breach of that duty.

Hope cites *Ayuluk v. Red Oaks Assisted Living, Inc.*[30] to argue that negligence claims against assisted-living providers require expert testimony, but the *Ayuluk* decision does not carve an exception for assisted-living providers out of the rule described above.  Rather, *Ayuluk* is consistent with that rule because it involved claims

---

[28]   For this reason we need not address Hope's argument that its staff are medical professionals or professionals of some other kind to whom a professional duty of care applies.

[29]   5 P.3d 225, 228 (Alaska 2000).

[30]   201 P.3d 1183 (Alaska 2009).

that assisted-living providers failed to exercise the experience and judgment required of these providers.[31]

The *Ayuluk* case involved claims against an assisted-living home, its administrators, and a caretaker it employed based on allegations that the caretaker improperly had sex with a patient with cognitive disabilities and that the home's administrators had been negligent in hiring and supervising the caretaker.[32] The plaintiff proffered two expert witnesses to testify about the standard of care applicable to the caretaker (who had been trained as a certified nursing assistant) and the home's administrators.[33] The superior court ruled that the proffered witnesses were not qualified to testify. We disagreed, holding that the experts were qualified to testify about and helpful to the jury's understanding of two issues: (1) the duty of a certified nursing assistant to avoid sexual contact with a client in his care, regardless of whether his employment required that certification; and (2) the duty of an administrator of an assisted living home to monitor for sexual contact between caregivers and residents.[34] Expert testimony was relevant and helpful to the jury in *Ayuluk* because the allegations of fault turned on the exercise of professional skill and judgment.[35] Expert testimony is not relevant, let alone required, in this case because the allegation of fault does not turn on the exercise of professional skill or judgment.

---

[31] *Id*. at 1191-94.

[32] *Id*. at 1188-90.

[33] *Id*. at 1191.

[34] *Id*. at 1192-94.

[35] Although we held that the expert testimony was admissible under Alaska Evidence Rule 702 because it was relevant and helpful, we did not address whether the testimony was *required*. *See id*.

-12-                                                                 7547

Hope's emphasis on its certification under the Medicaid Waiver Program is equally misplaced.[36] Hope's certification is irrelevant because this is a case of ordinary negligence, and thus no expert testimony is required. Surgeons undergo extensive licensing and certification, but "[w]here the surgeon saws off the wrong leg, . . . the jury may infer negligence without the aid of any expert."[37] The same principle applies here.

Finally, the estate is not bound to present expert testimony on the standard of care just because its complaint used the term "medical negligence." Although the complaint includes some allegations that suggest medical malpractice, it also clearly articulates the theory that Hope was negligent in "[f]ailing to advise others of [Courtney's] aspirations." The estate's discovery responses describe this theory of the case in elaborate detail, and Hope's own summary judgment briefing shows that it understood the estate's theory of the case. We therefore reject the argument that a reference to "medical negligence" in the complaint obligated the estate to present expert testimony otherwise unnecessary to prove the standard of care.

**B.    The Testimony Of Courtney's Treating Physician Is Sufficient Evidence Of Causation To Preclude Summary Judgment.**

Although the estate's theory of negligence is simple, its theory of causation is not. The estate asserts a three-step causal chain. First, the pneumonia that killed Courtney was caused by the August 25 aspiration, not some other aspiration, ailment, or her underlying condition. Second, had Hope promptly told Christine about this aspiration, she would have sought earlier treatment at the hospital. Third, earlier treatment would have prevented the pneumonia from causing Courtney's death.

---

[36]    7 AAC 130.205(d)(2)(C) (to be found eligible, recipient must "require . . . a level of care provided in a nursing facility").

[37]    *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 200 (Alaska 2000) (omission in original) (quoting W. Prosser, LAW OF TORTS § 32, at 165 (4th ed. 1971)).

Hope argues that the links in this causal chain cannot be established without expert testimony that the estate has failed to supply, so summary judgment should be affirmed. We agree with Hope that the estate's negligence claim cannot survive summary judgment without expert opinion to support its argument that Hope's actions were a substantial cause of Courtney's death.[38] But we agree with the estate that the deposition testimony of Courtney's treating physician, Dr. Than, suffices. Although this testimony is at times equivocal, when all inferences are drawn in favor of the estate — as they must be on summary judgment[39] — it creates a dispute of material fact about causation. It was therefore error to grant summary judgment to Hope.

### 1. The estate's theory of causation must be proved with the aid of expert medical opinion.

To prove a negligence claim, the plaintiff must show that the defendant's conduct caused the plaintiff's injury.[40] A complete lack of evidence establishing causation is grounds for summary judgment in favor of the defendant.[41] Even if there is

---

[38] "As a general rule, Alaska follows the 'substantial factor test' of causation." *Vincent by Staton v. Fairbanks Mem'l Hosp.*, 862 P.2d 847, 851 (Alaska 1993).

[39] *Kaiser v. Sakata*, 40 P.3d 800, 803 (Alaska 2002).

[40] *Kelly v. Municipality of Anchorage*, 270 P.3d 801, 803 (Alaska 2012) ("In order to succeed on a negligence claim, a plaintiff must prove duty, breach of duty, causation, and harm.").

[41] *Greywolf v. Carroll*, 151 P.3d 1234, 1241 (Alaska 2007) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986))).

some evidence showing causation, it "must not be too conclusory, too speculative, or too incredible to be believed" in order to defeat summary judgment.[42]

In some cases the causal connection between the defendant's conduct and the plaintiff's injury must be proved with the aid of a medical expert.[43] We alluded to this possibility in *Choi v. Anvil*, which involved a negligence claim arising out of an automobile crash.[44] We reasoned that "where alleged injuries . . . are of a common nature and arise from a readily identifiable cause, there is no need for the injured party to produce expert testimony."[45] The causal connection at issue in that case — between a rear-end automobile collision and the plaintiffs' neck, back, and arm injuries — was "easily understood by a jury" using "everyday experience," so no expert testimony was required.[46] But we recognized that expert testimony on causation may be necessary "when the nature or character of a person's injuries require the special skill of an expert to help present the evidence to the trier of fact in a comprehensible format."[47] In *Azimi v. Johns*, we suggested that the plaintiff's lack of an expert witness likely precluded him proving that his post-traumatic stress disorder was the result of a car accident because PTSD is not a "typical result[] of auto accidents."[48] And in *Punches v. McCarrey Glen*

---

[42] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014).

[43] *Choi v. Anvil*, 32 P.3d 1, 3-4 (Alaska 2001).

[44] *Id*. at 2.

[45] *Id*. at 4.

[46] *Id*. at 2-4.

[47] *Id*. at 3.

[48] 254 P.3d 1054, 1068 (Alaska 2011) (reversing dismissal pursuant to Alaska Civil Rule 41(b) because plaintiff's claim that car accident caused "general 'bodily
(continued...)

*Apartments, LLC* we affirmed partial summary judgment in favor of the defendant because the plaintiff failed to present expert testimony to establish a connection between mold exposure in her apartment and her alleged injuries, which included a fungal infection, skin abscesses, and chronic fatigue.[49] If the connection between the defendant's conduct and the plaintiff's injury is not readily apparent to a lay person relying on "everyday experience," the opinion of a medical expert is required to establish this connection.

The estate's theory of causation is not one that lay people relying on their everyday experience can reliably evaluate without the aid of an expert. As described above, there are three links in the estate's causal chain, and two of them require jurors to evaluate a causal connection that is not commonly part of lay people's everyday experience.

The first link in the causal chain is the estate's theory that the aspiration occurring on August 25 caused the pneumonia that killed Courtney. Courtney aspirated on at least 22 occasions while under Hope's care and aspirated again at the hospital shortly before her death. Courtney had several chronic conditions, and her treating physician described her as terminally ill. Without the aid of medical expertise, a lay person cannot reliably decide whether one particular aspiration event was a substantial cause of Courtney's death.

---

[48] (...continued) injury' and 'pain'" could be supported with lay testimony alone, in contrast to claim that car accident caused PTSD).

[49] 480 P.3d 612, 624-25 (Alaska 2021).

The third link in the chain is the estate's theory that earlier treatment would have saved Courtney's life.[50] Even assuming that the August 25 aspiration caused Courtney's pneumonia, the prognosis for and treatment of pneumonia "cannot be easily understood 'using everyday experience.' "[51] Jurors cannot reliably determine on their own whether bringing Courtney to the hospital earlier would have altered the progression of her disease. They need the opinion of a medical expert to do so, and therefore the estate's negligence claim cannot survive summary judgment without this evidence.

> **2. The opinions of Courtney's treating physician, when viewed in the light most favorable to Courtney, are sufficient evidence of causation to defeat summary judgment.**

Dr. Than was Courtney's primary care physician from 2011 until Courtney's death in 2015. As a treating physician, Dr. Than may testify as a "hybrid" witness, describing facts within her personal knowledge as well as offering an expert opinion about what caused Courtney's pneumonia and death.[52] And Hope has not suggested any procedural reason why Dr. Than would be barred from offering her opinion at trial. The estate's witness list includes "[a]ll persons named in [Hope's] [w]itness [l]ist" — which identifies Dr. Than as someone who "[m]ay testify regarding

---

[50] The second link in the chain — the estate's theory that Christine would have pursued earlier or more aggressive treatment had she known that Courtney aspirated on August 25 — does not require the support of expert medical testimony.

[51] *Punches*, 480 P.3d at 625 (quoting *Choi*, 32 P.3d at 4).

[52] *See Thompson v. Cooper*, 290 P.3d 393, 400 (Alaska 2012) (holding that treating physicians may offer opinion on causation based on "subjectively applying their practical experience to the particular facts of [plaintiff's] injury"); *Miller ex rel. Miller v. Phillips*, 959 P.2d 1247, 1250 (Alaska 1998) ("When physicians are called to testify about matters pertaining to the treatment of their patients, the distinction between an expert witness and a fact witness inevitably becomes blurred.").

observations, treatment and/or diagnosis(es)" — satisfying the civil rules' limited disclosure requirements for non-retained experts.[53]

Dr. Than's deposition testimony, when viewed in the light most favorable to the estate, is sufficient evidence of causation to defeat summary judgment. First, her testimony can support the estate's theory that Courtney's aspiration on August 25 caused the fatal bout of pneumonia. Dr. Than did not have access to Hope's records at the time of her deposition, so she was not aware of a specific aspiration event. Yet she believed that an aspiration had caused Courtney's pneumonia and opined that the aspiration occurred "[p]robably two weeks or 10 days" before Courtney was hospitalized. August 25 was two weeks and two days before Courtney's hospitalization on September 10 — roughly consistent with the timeframe Dr. Than suggested. Hope argues that Dr. Than "cannot opine that it is more likely than not" that the aspiration on August 25 caused Courtney's pneumonia. But had Dr. Than seen Hope's records and known that Courtney did in fact aspirate on August 25, Dr. Than's testimony may well have been more confident.[54]

Hope also argues that Dr. Than's testimony about the typical onset of pneumonia symptoms rules out the August 25 aspiration as the cause of Courtney's death. Dr. Than stated that symptoms of aspiration pneumonia "usually" appear within

---

[53]     Alaska R. Civ. P. 26(a)(2)(A) ("[A] party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Evidence Rules 702, 703, or 705."); *Fletcher v. S. Peninsula Hosp.*, 71 P.3d 833, 844-45 (Alaska 2003) (observing that requirements of Rule 26, such as production of an expert report, do not apply to non-retained experts such as treating physicians).

[54]     Hope points to Courtney's aspiration at the hospital on September 15 or 16 as a potential superseding cause of her death. However, Dr. Than testified that Courtney was already "pretty sick" at that time. Viewing this evidence in the light most favorable to the estate, a reasonable jury could believe that the later aspiration was deadly because Courtney was already weakened by pneumonia caused by the August 25 aspiration.

72 hours of the aspiration. Hope argues that "[t]he undisputed evidence shows that Courtney did not have any symptoms of clinical progression within 72 hours of the suspected aspiration event on August 25." Although true, this argument ignores Courtney's 30-second grand mal seizure on August 29. Dr. Than stated that increased seizures are a symptom of aspiration pneumonia. And although the seizure occurred slightly more than 72 hours after the aspiration, it is close enough to the period in which symptoms "usually" appear to support an inference that the August 25 aspiration caused the pneumonia that ultimately killed Courtney.

Second, Dr. Than's testimony can also support the inference that Courtney would have survived had she been brought to the hospital earlier. Dr. Than's deposition testimony was circumspect on this point. She opined that Courtney should have been brought to the hospital earlier than she was (on September 10). When asked if bringing Courtney to the hospital on September 6 would have "improved her ability to recover," Dr. Than stated it is "hard to decide, to make that assumption." But given the evidence of Courtney's symptoms starting on August 29, it is plausible to think that her mother would have brought her to the hospital even earlier than September 6 (the date on which she called the hospital about Courtney's failure to urinate) had she known about the aspiration. Therefore, when all inferences are drawn in favor of the estate, Dr. Than's testimony can be read to suggest that earlier treatment would have changed the outcome. This evidence creates a reasonable dispute of material fact about whether Hope's alleged failure to notify Christine of the aspiration delayed lifesaving treatment for Courtney's pneumonia and was therefore a substantial cause of her death. For this reason, it was error to grant summary judgment in favor of Hope.

## V.  CONCLUSION

We REVERSE the grant of summary judgment to Hope and REMAND for further proceedings consistent with this opinion.