NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Estate of | ) |
| | ) Supreme Court No. S-19152 |
| | ) |
| DANIEL ROMEY. | ) Superior Court No. 1KE-21-00110 PR |
| | ) |
| | ) MEMORANDUM OPINION |
| | ) AND JUDGMENT[*] |
| | ) |
| | ) No. 2134 – February 4, 2026 |
| | ) |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, Katherine H. Lybrand, Judge.

Appearances: Leif A. Thompson, Ketchikan, for Appellant. Scott A. Brandt-Erichsen, Keene & Currall, PPC, Ketchikan, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

## I.   INTRODUCTION

An elderly husband suffered a stroke one evening while at his remote home with his wife, who monitored her husband's condition without calling for immediate medical assistance. The following morning the husband's son visited and called for medical help; the husband was later medevacked to a hospital. During his

---

[*]   Entered under Alaska Appellate Rule 214.

monthlong stay he developed bilateral pulmonary emboli, which led to his death.  Per the terms of his will, his wife was appointed personal representative of his estate.

Two years after the husband's death — and after prolonged litigation in a separate quiet title action between the wife and son — the son filed a petition seeking to remove the wife as personal representative under Alaska's slayer statute.  The son alleged that the wife's delay in summoning medical assistance constituted felonious negligent homicide sufficient to trigger a provision in the slayer statute which required her removal as personal representative.  The wife moved to dismiss.  Following summary judgment motion work, the court held the wife owed no duty to summon medical care under the circumstances.  After dismissal, the court granted the wife's motion for enhanced attorney's fees.  The son appeals, arguing that the superior court erred in determining the wife owed no duty to summon medical treatment and that his expert's opinion failed to establish causation, and that the court abused its discretion in awarding enhanced attorney's fees.

Seeing no error in the superior court's grant of summary judgment as to causation, and no abuse of discretion in its award of attorney's fees, we affirm.[1]

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Daniel Romey and his wife Mary Carolyn Romey were of advanced age, living in a remote location in Thorne Bay, with extremely limited access to medical care.  As Mary explained in a deposition, the couple was at their home on the evening of June 19, 2021, when Mary noticed that Daniel "was not coherent."  Mary did not call emergency services that night and instead "tr[ied] to determine what was happening with Daniel."  She believed he had suffered a stroke and was trying to get a better sense

---

[1]    Because the issue of causation resolves the case, we decline to address whether spouses owe a duty to summon aid.

of the problem, since she herself had previously experienced only less severe-seeming strokes. The situation lasted "a couple of hours," during which Daniel was "not coherent at all" and had difficulty moving unassisted. Mary resolved to let Daniel rest.

The next morning, Samuel, Daniel's son, called Mary and learned about the stroke. He boated and then drove to the home. When he saw his father unconscious in bed, Samuel called multiple emergency medical services. Daniel was eventually put on a life flight to Ketchikan and hospitalized that day. Daniel was admitted for an "[a]cute [r]ight basal ganglion ischemic stroke." The intake forms also noted his "[h]istory of atrial fibrillation" as a "[m]odifying factor[]." After over a week of hospitalization, Daniel was discharged from medical surgical and transferred to a separate long-term care department. However, a few days later, he was transferred back to medical surgical due to a decline in his condition. His intake forms noted that he tested "positive for pulmonary embolism." The forms also noted that the "bilateral pulmonary emboli" were not present when he was first hospitalized, "so therefore [they] most likely occurred during [long-term care] admission as a result of chronic immobility after basal ganglia stroke."

On July 6, during his hospitalization, Daniel signed a quitclaim deed transferring the Thorne Bay marital home to Samuel. Mary did not sign or consent to the deed, which was recorded later that day. Daniel died on July 12, 2021, at 90 years old; his cause of death was listed as "bilateral pulm[onary] emboli." [2]

B. Proceedings

In August 2021, Mary filed an application for informal probate of will and appointment of personal representative, along with a copy of the will. She was

---

[2] Daniel's records alternatively refer to "pulmonary embolism" and "emboli." We use emboli when referring to the presence of multiple clots in Daniel's lungs, but use "embolism" when quoting directly from a document or referencing the condition generally.

subsequently appointed personal representative. Daniel's will devised his interest in real property to Mary. Mary became aware of the quitclaim deed to the Thorne Bay marital home and claimed the transfer was not valid. In January 2022, Mary, as personal representative, filed a quiet title action to determine the appropriate disposition of the property. In July 2023, Samuel filed a petition in the probate action to remove Mary as personal representative and invalidate Daniel's will.[3] As a basis for removal, the petition alleged "Mary feloniously killed Daniel within the meaning of AS 13.12.803," Alaska's so-called slayer statute.

The petition asserted that "[b]ecause Mary refused to ever call police or anyone else on the evening of Daniel's stroke," his treatment was delayed, which "greatly increased his chance of dying." On these grounds, the petition requested that Mary "forfeit her interest in the estate, [and] be removed as personal representative." Mary opposed the petition, seeking its dismissal and an award of attorney's fees.[4] Relevant here, Mary argued that the slayer statute could not apply because (1) there was no evidence that she caused Daniel's death; and (2) even if there was, she did not have a spousal duty of care that compelled her to call for help any sooner.[5]

---

[3] The removal petition at issue in this case ran concurrent with some of the quiet title proceedings. In March 2024, Samuel was awarded the Thorne Bay home, but not the connected lots, in the quiet title action.

[4] The court treated this as a motion for summary judgment because Mary attached a number of exhibits to her motion, including Daniel's death certificate, and various medical records from around the time of Daniel's death. Alaska R. Civ. P. 12(b).

[5] Duty is relevant because, to prevail on his criminally negligent homicide claim, which was the basis for removing Mary as personal representative and beneficiary under the will, Samuel would have to show that Mary failed to act despite having a duty to do so. *See, e.g.*, *Sickel v. State*, 363 P.3d 115, 117 (Alaska App. 2015) ("[T]he law does not punish a person's failure to act unless that failure to act constitutes a breach of that person's legal duty.").

At oral argument on her motion, Mary emphasized that Samuel needed to ground his theory of causation in expert testimony, since his theory of causation was "complicated . . . and [could not] be established based on the everyday experiences of a reasonable person." She pointed out that the death certificate only showed pulmonary emboli — not delay or stroke — as the cause of Daniel's death, and argued that because no expert testimony bridged the causal gap between Mary's alleged inaction and Daniel's death, the case should be dismissed. In response, Samuel requested that "the court should continue this hearing until [he] completed [his] discovery" so that he could better prove causation.

Shortly thereafter, the court granted Samuel's requested extension, allowing him "time to develop the record" but limiting the extension to two months "because [he] . . . had ample time otherwise to pursue his claims"; indeed, more than two years had elapsed between Mary's appointment and Samuel's requested extension. Samuel then timely filed a report from Dr. Zachary Threlkeld, whose two-page expert report addressed two questions: (1) whether "pulmonary embolism [is] a complication resulting from stroke generally and in Daniel's case in particular," and (2) whether "Daniel would have benefitted from prompt medical attention and what is the likelihood that he would have done so."

In response to the first question, Dr. Threlkeld opined that pulmonary embolism was "a common complication of hospitalization" and that stroke was "an independent risk factor" for pulmonary embolism. He concluded "[Daniel] suffered a fatal pulmonary embolism 23 days after he sustained [the stroke], without which the pulmonary embolism would very likely not have occurred." In response to the second, he explained that two "time-sensitive interventions" — thrombolysis and thrombectomy — benefit stroke patients like Daniel and that "[i]n [Daniel's] case, prompt evaluation in an emergency department would have led to prompt consideration of these [two] acute stroke treatments." He concluded that "[h]ad [Daniel] received

[either treatment], [he] would have had an increased likelihood of surviving the stroke with minimal or no disability."

The superior court partially granted and partially denied Mary's summary judgment motion. The court explained that Mary "made the initial showing that there are no material facts that remain in dispute relating to her duty," and that Samuel "ha[d] not established any genuine factual dispute supporting his claim that Mary had a duty to act and summon medical aid for Daniel." Additionally, the court explained that Samuel failed to present a genuine dispute of fact as to whether "a delay in medical care contributed to Daniel's death." In reaching this conclusion, the court evaluated Dr. Threlkeld's report and concluded that it did "not claim that earlier intervention would have reduced the likelihood of Daniel developing pulmonary emboli or the likelihood that those would be fatal." Instead, the report merely "establishe[d] what was already not in dispute: Daniel died from pulmonary emboli he developed after his stroke." Consequently, while the report provided "general information about post-stroke intervention," it did not "tie any delay in treatment to impacting Daniel's chances of developing a pulmonary embolism" and therefore did not create a genuine issue of fact about whether the delay in medical care caused Daniel's death.

Because Samuel could not prevail on his negligent homicide claim and "set[] forth no other basis for Mary's removal as personal representative," the court denied his petition. The court also denied Mary's request for attorney's fees under Alaska Civil Rule 11, but noted that she could move for enhanced attorney's fees under Alaska Civil Rule 82 as the prevailing party, which Mary then did. The court granted Mary's motion, "find[ing] it appropriate to vary the attorney fee award" and "award[ed] Mary 75% of her attorney fees," totaling $16,644.85 and $112.40 in costs.

Samuel appeals both the dismissal of the petition and the award of enhanced attorney's fees.

## III. STANDARD OF REVIEW

"We review summary judgment orders de novo, 'drawing all reasonable inferences in the nonmovants' favor and viewing all facts in the light most favoring them.' "[6] "In reviewing summary judgment orders, we apply our independent judgment to determine whether there are any genuinely disputed issues of material fact."[7] We will affirm a grant of summary judgment "if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law."[8]

We "review an award of attorney's fees under Alaska Civil Rule 82, including an award of enhanced attorney's fees, for abuse of discretion."[9] We will "find an abuse of discretion [only] if an award is 'arbitrary, capricious, manifestly unreasonable, or the result of an improper motive.' "[10] "When reviewing an enhanced fee award, we generally assess the legal and factual viability of parties' claims de novo and review findings of fact for clear error."[11]

## IV. DISCUSSION

The superior court properly granted summary judgment on Samuel's petition to remove Mary as personal representative. To prevail on a criminally negligent homicide claim such as that underlying Samuel's petition, one must show that

---

[6] *Whitney v. State Farm Mut. Auto. Ins. Co.*, 258 P.3d 113, 116 (Alaska 2011) (quoting *Kaiser v. Sakata*, 40 P.3d 800, 803 (Alaska 2002)).

[7] *Lane v. Ballot*, 330 P.3d 338, 341 (Alaska 2014).

[8] *Guilford v. Weidner Inv. Servs., Inc.*, 522 P.3d 1085, 1092-93 (Alaska 2023) (quoting *Miller v. Fowler*, 424 P.3d 306, 310 (Alaska 2018)).

[9] *Bragg v. Teslow*, 533 P.3d 533, 538 (Alaska), *revised on reh'g* (Aug. 18, 2023) (quoting *Sykes v. Lawless*, 474 P.3d 636, 646-47 (Alaska 2020)).

[10] *Sykes*, 474 P.3d at 647 (alteration in original) (quoting *Keenan v. Meyer*, 424 P.3d 351, 356 (Alaska 2018)).

[11] *Bragg*, 533 P.3d at 539 (quoting *Sykes*, 474 P.3d at 647).

the defendant "cause[d] the death of another person."[12] "A complete lack of evidence establishing causation is grounds for summary judgment in favor of the defendant."[13]

Samuel challenges the superior court's determination, asserting errors related to duty and causation. First, he argues that the "court erred in finding that a wife has no duty . . . to render aid" when her spouse suffers a "bad stroke." And second, he argues that the court erred in ruling that he failed to present evidence of a "causal link between Daniel's stroke and his death from pulmonary embolism." Samuel also challenges the attorney's fees award on the grounds that it was excessive. We conclude that Samuel has not shown a genuine dispute of material fact regarding causation. Accordingly, because his claim cannot succeed without prevailing on causation, we need not reach his spousal duty argument. We also conclude that the superior court's fee award was within its discretion.

## A. Samuel Failed To Raise A Genuine Issue Of Material Fact Regarding Whether Mary's Delay In Seeking Treatment Caused Daniel's Death.

The parties did not dispute that Daniel died due to the pulmonary emboli. Their dispute centered around whether the intervening delay in medical treatment caused the pulmonary emboli. We conclude that because Samuel failed to set forth evidence suggesting that the pulmonary emboli were caused by delay in Daniel's treatment, the superior court appropriately granted summary judgment in Mary's favor.

As a threshold matter, once Mary met her burden of showing that no evidence linked any delay in medical care to the development of pulmonary emboli, Samuel was required to demonstrate an issue of material fact[14] and proffer expert testimony supporting that purported link. In *Culliton v. Hope Community Resources,*

---

[12]    AS 11.41.130(a).

[13]    *Culliton v. Hope Cmty. Res., Inc.*, 491 P.3d 1088, 1096 (Alaska 2021).

[14]    *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014).

*Inc.*, we held that "[i]f the connection between the defendant's conduct and the plaintiff's injury is not readily apparent to a lay person relying on 'everyday experience,' the opinion of a medical expert is required to establish this connection."[15] There, we required medical expert testimony because the theory of causation involved multiple causal links and potentialities, including the decedent's chronic conditions, her treating physician's belief she was terminally ill, and the question "whether one particular aspiration event was a substantial cause of [the decedent's] death."[16] Generally, the more overlapping medical concerns there are, the more likely an expert is required.[17] We recognized that in the face of overlapping medical concerns, the question "whether bringing [decedent] to the hospital earlier would have altered the progression of her disease," is one of causation that must be addressed by a medical expert's opinion.[18]

Where expert testimony is required, equivocal causal opinions by an expert can create a factual dispute sufficient to survive summary judgment.[19] In *Culliton*, we held that an expert's testimony created a genuine dispute of fact as to whether earlier treatment would have prevented the decedent's death, even though the testimony "was circumspect on [that] point."[20] The witness, a "hybrid" witness testifying as both an expert and the decedent's treating physician, agreed with the

---

[15]    491 P.3d at 1097.

[16]    *Id*.

[17]    *See id.*

[18]    *Id.*; *see also Goodwin v. Mat-Su Midwifery, Inc.*, 562 P.3d 26, 42 (Alaska 2024) ("This question involves the interplay between obstetrical practice and the nature of [decedent's] underlying condition, which lay people cannot reliably answer without the help of an expert.").

[19]    *See Culliton*, 491 P.3d at 1096-98.

[20]    *Id.*

decedent's estate that an aspiration had caused the decedent's pneumonia but could not pinpoint the specific aspiration event.[21] In addition, the expert testified that although it was difficult to assume that bringing the decedent in at least four days earlier would have "improved her ability to recover," the decedent nonetheless "should have been brought to the hospital earlier."[22] Importantly, the expert provided her opinion without the benefit of the full medical record which contained information that ultimately supported her opinion. We recognized that the expert may well have been more confident had she seen these records.[23] Drawing all inferences in favor of the decedent's estate, we reasoned that the expert's testimony "can be read to suggest that earlier treatment would have changed the outcome."[24] As such, the testimony created a reasonable dispute of material fact and defeated summary judgment.

In this case, the overlapping medical concerns at play left little doubt that expert testimony was required. Samuel's causal arguments all hinge on a number of complex medical considerations: whether earlier admission would have prevented Daniel's pulmonary emboli; the availability of thrombolysis, thrombectomy, and other prompt treatment given Daniel's remote location and limited access to care; the impact of Daniel's immobility on the development of pulmonary emboli; and Daniel's status as a 90-year-old man with preexisting conditions. Thrombolysis and thrombectomy alone are treatments that a lay person relying on their "everyday experience" would likely not recognize, much less understand. Layering additional medical factors onto the availability and efficacy of these treatments only complicates understanding further.

---

[21]   *Id.*

[22]   *Id.* at 1098-99.

[23]   *Id.* at 1996-98.

[24]   *Id.* at 1099.

The overlapping medical concerns here prevent a determination of causation without medical expert testimony.

Although Samuel did obtain an expert's opinion, that opinion did not link Daniel's delayed treatment to his fatal pulmonary emboli. Instead, Dr. Threlkeld's report stated that had Daniel not experienced a stroke, "the pulmonary embolism would very likely not have occurred." This statement merely provides that the stroke itself likely led to Daniel's death — a point not in dispute. Dr. Threlkeld's report did not say that the delay in Daniel's treatment caused his fatal pulmonary emboli.

Dr. Threlkeld's report did note "two potential time-sensitive interventions" with which Daniel "would have had an increased likelihood of surviving the stroke with minimal or no disability." The first, thrombolysis, "must be given within 4.5 hours of stroke onset." The second, thrombectomy, is a surgical intervention meant to treat "stroke caused by a blood clot in a major artery that supplies the brain." Dr. Threlkeld opined that Daniel's "prompt evaluation in an emergency department would have led to prompt consideration of these acute stroke treatments." Yet Dr. Threlkeld's opinion was silent as to whether Daniel had local access to such medical treatment, much less whether he could have realistically made it from Thorne Bay to a medical center capable of timely administering either treatment. Instead, Dr. Threlkeld simply stated that Daniel "would more likely than not [have] been a candidate for thrombolysis until 12:30 AM on [the morning following his stroke]," and that "he may also have been a candidate for thrombectomy."

Samuel argues that Dr. Threlkeld's report helps establish causation. Samuel states that pulmonary emboli are caused by immobility and immobility is caused by strokes. According to Samuel, this means that if someone survives a stroke with minimal or no disability, then he has a drastically lessened chance of developing a pulmonary embolism and then dying from it. Yet implicit in this chain of reasoning are intuitive gaps that Dr. Threlkeld's report does not help bridge. Even assuming Mary's

delay prevented consideration of both interventions, it is not clear that having an "increased likelihood of surviving . . . with minimal or no disability" would have prevented the development of the pulmonary emboli that killed Daniel. Dr. Threlkeld said nothing about whether either treatment would have reduced Daniel's immobility, nor did he state or suggest that immobility alone leads to pulmonary emboli. Thus, even taking the evidence in the light most favorable to Samuel, he failed to demonstrate an issue of material fact with respect to causation.

Moreover, while Dr. Threlkeld did say that "immobility" is a "risk factor[]" for pulmonary embolism, he noted that "hospitalization" and "surgery" are risk factors as well. That means that, had Daniel received either intervention, he would have still been exposed to pulmonary embolism risk factors: hospitalization and surgery. Yet Dr. Threlkeld's report did not state that immobilization without additional intervention (which Daniel received) is riskier than further hospitalization and surgery (which Samuel argues Daniel should have received). As such, there are too many unanswered questions and intuitive gaps in Dr. Threlkeld's report to support Samuel's argument.

B. **Awarding Enhanced Attorney's Fees Was Not An Abuse Of Discretion.**

The superior court did not abuse its discretion when it varied the attorney's fees award and granted Mary 75% of her fees. The award of attorney's fees to the prevailing party is governed by Alaska Civil Rule 82.[25] The rule sets out a standard schedule but allows for enhanced fees if "the court determines a variation is warranted" based upon a number of factors.[26] "The superior court has broad discretion to enhance attorney's fees above the amount prescribed by the Civil Rule 82(b)(2) schedule."[27]

---

[25] Alaska R. Civ. P. 82.

[26] Alaska R. Civ. P. 82(b)(1)-(3).

[27] *Ware v. Ware*, 161 P.3d 1188, 1199 (Alaska 2007).

While we review the overall fee award for abuse of discretion, "[w]hen reviewing an enhanced fee award, we generally assess the legal and factual viability of parties' claims de novo and review findings of fact for clear error."[28]

In this case, the superior court based its enhanced attorney's fees award on the following three statutory factors: the complexity of the litigation, the attorney's efforts to minimize fees, and the reasonableness of the claims and defenses pursued by each side.[29] Because it did not abuse its discretion enhancing fees based on its conclusion for each factor, we affirm the superior court's award.

### 1. The complexity of the litigation

The superior court did not clearly err when it concluded that Samuel unnecessarily complicated the litigation. In *Ware v. Ware*, we upheld an enhanced attorney's fees award, where the superior court reasoned that "although the issues involved were not inherently complex, plaintiff's conduct of the litigation," such as failing to file necessary witness lists, "added additional and unnecessary levels of complexity to the action," which necessitated "additional time . . . to prepare for unknown contingencies."[30]

Here, Samuel similarly complicated otherwise straightforward legal claims. Samuel brought the petition to remove Mary as personal representative; given the two years between Daniel's death and the filing of the petition to remove, it was incumbent on Samuel to prepare his case in a timely fashion and be prepared to proceed. Yet Samuel did not seek Daniel's complete medical records nor did he attempt to seek out expert testimony until after full briefing on Mary's initial motion to dismiss and during oral argument on the motion. In awarding enhanced fees, the superior court

---

[28] *Bragg v. Teslow*, 533 P.3d 533, 539 (Alaska 2023) (citing *Sykes v. Lawless*, 474 P.3d 636, 647 (Alaska 2020)).

[29] Alaska R. Civ. P. 82(b)(3)(A), (E), (F).

[30] 161 P.3d at 1199-1200.

noted that "Samuel's conduct added additional and unnecessary levels of procedural complexity," prolonging a dispute that, just like in *Ware*, was otherwise "not inherently complex." Despite "recogniz[ing] from his first pleading that he would need . . . expert testimony," Samuel "did not make any meaningful efforts" to obtain the opinion he needed until after oral argument when it appeared dismissal was imminent.

### 2. Efforts to minimize fees

The superior court did not clearly err in concluding that Mary's attorney attempted to minimize fees. Actions that reduce the hours of work expended on a case — whether an actual reduction or mere write-off — generally count as efforts to minimize fees.[31] In *Ware* we also noted that counsel made sufficient efforts to minimize fees where he "charged less than his standard billing rate, wrote off substantial time . . . and charged no time against this case in instances where there was any question as to whether the work was generated by this case or a closely related case."[32]

Mary's attorney took actions that reduced the hours of work expended. The superior court noted that Mary's attorney "attempted to reduce the amount of time spent litigating" discovery issues and reduce the "amount of time on hearing preparation so as to reduce Mary's fees." These actions ultimately reduced the total fees for which Mary was responsible and therefore further support an enhanced attorney's fee award.

### 3. Reasonableness of the claims and defenses

The superior court did not err in concluding that Samuel's claims were unreasonable. The bar for reasonableness is not high; even a position that only has support from contested evidence can be reasonable.[33] In *Alderman*, we reversed an enhanced attorney's fees award because, after reviewing "the conflicting testimony

---

[31]  *Id.* at 1200 & n.54.

[32]  *Id.*

[33]  *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 144 (Alaska 2004).

presented at trial," we "[could not] say that the [appellants'] defense was unreasonable."[34] Some evidence, even if contested, was enough to support a claim of reasonableness.

Yet here, there is no contested evidence to support Samuel's claims. The court explained that he "never meaningfully briefed" the issue of whether there was a spousal duty to seek medical care, and noted that his claims were "largely focused on his personal belief" — without factual support — that Mary caused Daniel's death. This lack of briefing and factual support is especially egregious given the two-year delay between Daniel's death and the filing of Samuel's removal petition — his petition was not grounded in facts gleaned during those two years, meaning Samuel had plenty of time to thoughtfully consider his claims or develop facts during the concurrent litigation, but did not. His claim also "lacked any medical support" despite sufficient access to medical records, including medical records received during the Thorne Bay property dispute. Moreover, he did very little to remedy his evidentiary scarcity. One of Mary's first arguments in her response to Samuel's removal petition was that his claim failed for lack of causation. Even so, it was not until oral argument months later that Samuel seemingly determined he should develop evidence in support of causation, yet he still failed to provide even contested evidence.

Given the general lack of support for Samuel's claims, as well as his complication of an otherwise straightforward matter, and Mary's attorney's efforts to minimize fees, the superior court did not abuse its discretion in awarding enhanced attorney's fees.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's dismissal of Samuel's petition and award of enhanced attorney's fees.

---

[34] *Id.*