*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TAMMIE GUILFORD, | ) | |
| | ) | Supreme Court Nos. S-17591/17611 |
| Appellant and | ) | |
| Cross-Appellee, | ) | Superior Court No. 3AN-15-08984 CI |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| WEIDNER INVESTMENT | ) | No. 7639 – January 13, 2023 |
| SERVICES, INC., | ) | |
| | ) | |
| Appellee and | ) | |
| Cross-Appellant. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Nicholas Kittleson, Kittleson Law Office, LLC, Anchorage, for Appellant/Cross-Appellee. Gregory R. Henrikson, Walker & Eakes, LLC, Anchorage, for Appellee/Cross-Appellant.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

BORGHESAN, Justice.

## I.      INTRODUCTION

A landlord tried to evict a tenant for nonpayment of rent. The tenant counterclaimed under Alaska's Uniform Residential Landlord Tenant Act (URLTA), seeking damages for a variety of alleged harms: retaliatory eviction; failure to return her

security deposit; intentional misrepresentation of certain fees; and personal injury and emotional distress caused by mold in the apartment, which the tenant alleged was a violation of the landlord's duty under URLTA to maintain fit premises.

The litigation unfolded over several years, leading to a mixed result. The eviction was denied. The court entered summary judgment against the tenant's damages claim for personal injury on the ground that the tenant failed to provide expert opinion evidence supporting the link between mold exposure and her health problems. After trial, a jury awarded the tenant modest damages for misrepresentation and for emotional distress caused by mold exposure. The jury found in the landlord's favor on the retaliatory eviction and security deposit claims. The superior court awarded the tenant partial attorney's fees, using a "blended analysis" that relied on both Alaska Civil Rule 82 and on URLTA's provision for full reasonable fees and then discounting the award due to the tenant's limited success.

The tenant appeals the grant of summary judgment on her personal injury claim and the attorney's fees calculation. The landlord cross-appeals, arguing the superior court erred in a number of its evidentiary decisions, by permitting the tenant to recover emotional distress damages for a breach of URLTA's duty to maintain fit premises, and by awarding the tenant attorney's fees as the prevailing party.

We affirm the superior court's evidentiary rulings. We also affirm its decision to permit recovery of emotional distress damages caused by violations of the duty to maintain fit premises. But we reverse summary judgment against the tenant's personal injury claim. Medical records in which the tenant's treating physician suggested that mold exposure may have been the cause of her health problems amount to sufficient expert medical opinion that, when viewed in the light most favorable to the tenant as the non-moving party, create a genuine issue of material fact that must be resolved at trial.

Because we reverse summary judgment on the tenant's personal injury claim, the attorney's fee award must be vacated. Yet we address the superior court's holding that Civil Rule 82, and not URLTA's attorney's fee provision, applies to a damages claim for personal injuries even when those injuries stem from conditions that violate the landlord's duty under URLTA to maintain fit premises. Such a claim arises out of the common law of torts, not URLTA. Therefore we see no error in the superior court's decision to apply Civil Rule 82 to fees incurred in pursuit of the tenant's personal injury claim. Yet we conclude that discounting the tenant's award of attorney's fees due solely to the disparity between her modest damages recovery and the amount of fees incurred to achieve it was error.

## II.    FACTS AND PROCEEDINGS

### A.    Eviction Action And Counterclaims

In October 2008 Tammie Guilford began renting an apartment from Weidner Investment Services, Inc. in Anchorage. Guilford was often behind on rental payments, and Weidner filed forcible entry and detainer (FED) actions[1] against her in May, June, and July of 2015, each of which was dismissed.

In August 2015 Weidner filed another FED action because Guilford had not paid rent. The district court held a hearing on the matter later that month. Guilford testified that she had attempted to pay the rent but that Weidner refused to accept it and demanded approximately $900 in extra fees. Guilford testified that she was willing and able to deposit her rent payment with the court pending resolution of the claims. A Weidner employee disputed that Guilford had offered to pay rent. The district court found that Guilford testified credibly that she attempted to pay the rent and that it was not accepted. The district court denied the eviction and ordered Guilford to pay the

---

[1]    *See* AS 09.45.060-.160 (describing eviction procedures).

August rent and all subsequent rent into a court registry until the dispute was resolved.

A second FED hearing was held a month later. Weidner alleged that Guilford had not paid the September rent into the registry on time; Guilford blamed her late payment on her medical conditions and a problem with the court's registry.

Guilford raised counterclaims to the FED under URLTA.[2] She alleged that Weidner had breached its duty under AS 34.03.100 to maintain the premises in a "fit and habitable condition," that it was trying to evict her in response to her complaints, that it failed to return her security deposit, and that it fraudulently added charges to her electric bill.

Guilford alleged that Weidner failed to maintain fit premises by allowing excessive mold to accumulate in the apartment, which she alleged caused her physical injuries. She alleged that she started experiencing significant medical problems around a year after she moved in. Her alleged health problems included facial swelling and angioedema,[3] allergic reactions, and severe respiratory issues including asthma and respiratory failure. Guilford was hospitalized several times during her tenancy.

According to Guilford, the apartment building had a "massive problem with moisture" and her apartment had problems with water intrusion, mold, and rodents. Guilford alleged that when she complained about mold problems, Weidner employees told her to wash and bleach the moldy areas. Guilford claimed that mold in her apartment caused her medical problems and that her symptoms stopped when she began

---

[2]     AS 34.03.010-.380.

[3]     Angioedema, synonymous with "giant hives," is defined as "[r]ecurrent large circumscribed areas of subcutaneous or mucosal edema of sudden onset, usually disappearing within 24 hours; frequently, an allergic reaction to foods or drugs." *Angioedema*, STEDMAN'S MEDICAL DICTIONARY, Westlaw (database updated Nov. 2014).

staying at a friend's home. She said she moved back into her apartment after a home inspector's report found no evidence of mold or moisture in the apartment, but her symptoms quickly reappeared. Guilford moved out permanently in March 2016 and claims to have suffered no additional angioedema episodes since leaving.

## B. Pretrial Motion Practice And Evidentiary Rulings

In December 2016 Weidner moved for partial summary judgment on Guilford's personal injury claim as well as several other issues. Weidner presented an expert's opinion that Guilford's alleged angioedema was "unrelated to mold" and was probably genetic and that there was "no credible evidence of any relationship" between her asthma and mold. The expert also stated that there was "absolutely no medical literature . . . linking exposure to mold and the development of angioedema." Guilford opposed, arguing that the expert report was inadmissible hearsay and that expert testimony was not necessary to show that mold caused her symptoms because the causal relationship was readily apparent.

In July 2017 the district court denied summary judgment, agreeing with Guilford that she was not required to provide expert testimony because the connection between mold and her symptoms was "reasonably apparent." In November Guilford moved to transfer the case to the superior court because her alleged damages exceeded $100,000.[4] The motion was granted.

Weidner again moved for summary judgment on Guilford's personal injury claim; Guilford opposed. The superior court granted summary judgment for Weidner, concluding that causation was not readily apparent. The superior court found that because Guilford had provided "no competent expert evidence" to contradict the opinion

---

**4** *See* AS 22.15.030(a)(1) (providing that district courts have no jurisdiction over civil cases in which amount of damages claimed exceeds $100,000).

of Weidner's expert that Guilford's symptoms were unrelated to mold, there was no genuine dispute of material fact about the cause of Guilford's injuries. The court scheduled a jury trial on the remaining issues.

The court made several evidentiary rulings before trial. Weidner moved to exclude the testimony of other tenants in the same apartment building, arguing that their proposed testimony was irrelevant and prejudicial. The court denied the motion. The court declined to reconsider the issue when Weidner renewed its motion during trial, concluding that "[h]abitability is sort of a broad subject" and that other tenants' experiences with the conditions of the building were relevant to the case.

Guilford moved to exclude several of Weidner's proposed witnesses who had not been named until Weidner's final witness list, filed 15 days before trial. Weidner opposed, arguing that Guilford was made aware of their existence in the course of discovery. The court excluded the witnesses. Weidner moved for reconsideration, pointing out that the court had not issued a pretrial order and therefore there was no strict deadline for final witness lists. The court denied the motion for reconsideration.

The Friday before trial, Weidner announced that it had recently discovered over 300 photographs and a video of Guilford's apartment taken when she moved out. The court excluded the photographs and video. The court observed that "[t]he purpose of discovery is undermined . . . if, after three years of litigation suddenly we produce . . . 300 photographs of the condition of an apartment."

## C. Trial, Verdict, And Attorney's Fee Award

A jury trial was held in July 2019. Weidner objected to Guilford's opening statement, which mentioned that the district court had found that Guilford attempted to pay her rent. The superior court overruled the objection, concluding that the finding was res judicata. The court later instructed the jury that "Guilford offered to pay her rent on August 1, 2015."

Weidner objected to the admission of publications about mold published by the Occupational Safety and Health Administration (OSHA), the Environmental Protection Agency (EPA), and the Alaska Department of Health & Social Services (DHSS) that Guilford offered to support her habitability claim. Weidner argued these documents were hearsay, but the court admitted them under the public record exception to the hearsay rule.[5]

The parties also disputed whether emotional distress damages are permitted under URLTA. The court ultimately instructed the jury that it could award damages to compensate Guilford "for the discomfort, annoyance, and other mental and emotional distress she suffered from living in inadequate housing."

At the close of trial Weidner moved for a directed verdict on several issues, including Guilford's claim that it had fraudulently misrepresented fees on her electric bill. The court denied the motion for a directed verdict on the intentional misrepresentation claim. The court concluded that the issue came down to credibility of the witnesses because "[n]obody from Weidner has admitted that they were committing fraudulent misrepresentations, but inferences can be drawn from the party's conduct."

The jury found that Weidner breached its duty to keep Guilford's apartment in a fit and habitable condition and that it made intentional misrepresentations relating to electric utility charges, but the jury did not find that Weidner had evicted Guilford in retaliation for her complaints or that it failed to timely return her security deposit. It awarded Guilford $7,325 in damages, including $5,835 for "Discomfort, Annoyance, Inconvenience, and Mental Distress."

---

[5]    *See* Alaska R. Evid. 803(8) (exempting from hearsay rule certain government "records, reports, statements, or data compilations . . ., or matters observed pursuant to duty imposed by law and as to which there was a duty to report, [and] factual findings resulting from an investigation made pursuant to authority granted by law").

Each party filed a motion for attorney's fees, claiming to be the prevailing party. The superior court found that Guilford was the prevailing party because she successfully defended against Weidner's claims and succeeded on two of her counterclaims. But the superior court recognized that "the overall result of the four years of litigation is quite mixed." It also rejected Guilford's argument that URLTA's attorney's fee provision, which authorizes full reasonable fees to the prevailing party,[6] applied to all of her claims. Instead it calculated the attorney's fee award with a "blended analysis" by applying Civil Rule 82 (which authorizes award of partial fees to the prevailing party[7]) to fees incurred in pursuit of the personal injury claim and URLTA's attorney's fee provisions to the remainder of Guilford's claims. First, the court deducted from the total amount of fees Guilford incurred the portion incurred pursuing the unsuccessful personal injury claim. Second, it deducted 80% of the reasonable attorney's fees that Weidner incurred while defending against the personal injury claim, determining that Guilford's pursuit of the personal injury claim was objectively unreasonable.[8] Finally, the court reduced Guilford's remaining fees by 50% "because of the vast disparity between the fees and the actual award," reasoning that URLTA's attorney's fee provision "should not be applied as if it were a guarantee of full employment for lawyers." As a result, the superior court granted Guilford $22,803.40 in attorney's fees.

---

[6] AS 34.03.350; *Dawson v. Temanson*, 107 P.3d 892, 897 (Alaska 2005).

[7] Alaska R. Civ. P. 82.

[8] Alaska R. Civ. P. 82(b)(3)(G) (permitting court to vary presumptive award of 20% of reasonable fees incurred due to "vexatious or bad faith conduct").

### D.    Appeal

Guilford appeals the superior court's summary judgment order dismissing her personal injury claim.  She argues that expert testimony was not required to survive summary judgment on the issue of whether her injuries were caused by mold in the apartment.  Guilford also appeals the attorney's fee award, arguing that the court should have awarded her full reasonable attorney's fees by applying URLTA's fee provision only and that it should not have given Weidner a credit for fees incurred in defense of the personal injury claim.

Weidner raises several issues on cross-appeal.  It argues that the superior court erred by instructing the jury that Guilford offered to pay her rent on August 1, 2015.  It then challenges the court's evidentiary decisions to allow Guilford to call other tenants as witnesses, to exclude Weidner's late-disclosed witnesses, and to exclude the 300 photographs and video it provided to Guilford on the eve of trial.  Weidner also argues that the court erred when it admitted the government publications concerning the dangers of mold.  Weidner argues that the court should not have permitted the jury to consider damages for emotional distress and that the court should have granted Weidner's motion for a directed verdict on Guilford's misrepresentation claims. Finally, Weidner argues that it was the prevailing party because it was granted summary judgment "on the main issue of personal injury."

## III.    STANDARDS OF REVIEW

"We review a grant of summary judgment de novo, 'affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law.' "[9]  In determining whether any genuine issue of material fact exists, we

---

[9]    *Miller v. Fowler*, 424 P.3d 306, 310 (Alaska 2018) (quoting *Kelly v. Municipality of Anchorage*, 270 P.3d 801, 803 (Alaska 2012)).

draw all factual inferences in favor of the party against whom summary judgment was granted.[10] Whether expert testimony is required to show causation at summary judgment is a question of law that we review de novo.[11]

Whether res judicata or collateral estoppel applies is also a question of law that we review de novo.[12] Statutory interpretations are likewise reviewed de novo.[13] "When construing statutes, we consider three factors: 'the language of the statute, the legislative history, and the legislative purpose behind the statute.' "[14]

We review the superior court's evidentiary rulings for an abuse of discretion.[15] Errors in the admission or exclusion of evidence warrant reversal only if necessary to ensure "substantial justice."[16]

We review a grant or denial of a motion for a directed verdict de novo, asking "whether the evidence, when considered in the light most favorable to the

---

[10]    *Id.*

[11]    *See Culliton v. Hope Cmty. Res., Inc.*, 491 P.3d 1088, 1093 (Alaska 2021) (citing *Punches v. McCarrey Glen Apartments, LLC*, 480 P.3d 612, 624-25 (Alaska 2021)).

[12]    *McElroy v. Kennedy*, 74 P.3d 903, 906 (Alaska 2003).

[13]    *Oels v. Anchorage Police Dep't Emps. Ass'n*, 279 P.3d 589, 595 (Alaska 2012).

[14]    *Id.* (quoting *Shehata v. Salvation Army*, 225 P.3d 1106, 1114 (Alaska 2010)).

[15]    *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016) (quoting *Noffke v. Perez*, 178 P.3d 1141, 1144 (Alaska 2008)).

[16]    *Id.* (quoting *Loncar v. Gray*, 28 P.3d 928, 930 (Alaska 2001)).

nonmoving party, is such that reasonable persons could not differ in their judgment."[17]

"Whether the court applied the proper legal analysis to calculate attorney's fees is a question of law we review de novo."[18] When the correct legal analysis is applied, we review the subsequent award of attorney's fees for abuse of discretion.[19]

## IV. DISCUSSION

### A. It Was Error To Dismiss Guilford's Personal Injury Claim On Summary Judgment.

Guilford appeals the superior court's grant of summary judgment dismissing her personal injury claim. The court dismissed the claim after concluding that Guilford failed to establish a genuine dispute of material fact as to whether the mold in her apartment caused her health problems. The court ruled that Guilford failed to present any expert testimony to contradict the opinion of Weidner's medical expert that the conditions for which Guilford sought treatment were not caused by mold in her apartment. And it reasoned that Guilford's "subjective lay testimony" was not sufficient to create a material dispute of fact about the cause of her injuries because whether environmental mold could cause those kinds of injuries was not a fact "reasonably apparent to an ordinary layperson," citing our decision in *Choi v. Anvil*.[20] Whether Guilford presented enough evidence to survive summary judgment is a question of law

---

[17] *Todeschi v. Sumimoto Metal Mining Pogo, LLC*, 394 P.3d 562, 570 (Alaska 2017) (quoting *Noffke*, 178 P.3d at 1144).

[18] *Kollander v. Kollander*, 322 P.3d 897, 903 (Alaska 2014) (quoting *Weimer v. Cont'l Car & Truck, LLC*, 237 P.3d 610, 613 (Alaska 2010)).

[19] *Id.*

[20] 32 P.3d 1, 3 (Alaska 2001).

we review de novo.[21]

Guilford argues that summary judgment was error because Weidner failed to meet its initial burden of "proving, through admissible evidence, that there are no genuine issues of material fact and that [it was] entitled to judgment as a matter of law."[22] Specifically, Guilford argues that the affidavit of Weidner's expert was not admissible under Alaska Civil Rule 56(c) because it "contains opinion, not fact, and was not made through personal knowledge." But we have consistently accepted the use of expert affidavits to support summary judgment.[23] The affidavit of Weidner's expert was sufficient to establish, as an initial matter, a lack of causation between mold in Guilford's apartment and her medical condition.

Nevertheless, Guilford met her burden to produce contrary evidence. Medical records attached to Guilford's opposition to summary judgment, which arguably show her treating physician's belief that mold exposure may have been the cause of her health problems, were sufficient evidence to create a genuine dispute of material fact.[24] She did "not need to produce enough evidence to persuade the court that [she] would

---

[21] *See Miller v. Fowler*, 424 P.3d 306, 310 (Alaska 2018).

[22] *James v. Alaska Frontier Constructors, Inc.*, 468 P.3d 711, 717 (Alaska 2020).

[23] *See, e.g.*, *Parker v. Tomera*, 89 P.3d 761, 765-67 (Alaska 2004) (affirming grant of summary judgment in favor of defendants based on affidavit of expert physician that procedure was not the cause of plaintiff's medical problem, which plaintiff failed to rebut); *Achman v. State*, 323 P.3d 1123, 1130 (Alaska 2014) (noting rule that expert opinion admissible at trial is admissible for summary judgment purposes).

[24] *See James*, 468 P.3d at 717 (describing non-moving party's burden to "present specific facts showing there is 'evidence reasonably tending to dispute or contradict' the moving party's evidence, thereby creating a genuine issue of material fact" (quoting *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014))).

prevail at trial, only enough evidence to demonstrate a genuine issue of material fact."[25]

The superior court did not err in concluding that the causal relationship between mold exposure and various ailments is complex enough that it must be established with medical opinion evidence. We recently affirmed summary judgment in a case with facts similar to this one because the plaintiff provided "no proof beyond her personal belief that her ailments were caused by [mold] in her apartment."[26]

Yet even when the causal relationship between certain facts and alleged injuries is so complex that it must be established through medical opinion, a party does not necessarily have to produce the affidavit of a retained expert to defeat summary judgment. Admissible evidence showing the opinion of a treating physician suffices. In *Culliton v. Hope Community Resources, Inc.* the estate of a deceased woman sued her caretakers, alleging that they failed to notify her mother that the woman (who was severely disabled) had aspirated food or liquid.[27] As a result, the estate alleged, the mother failed to recognize the symptoms of pneumonia and seek treatment until it was too late, causing the woman's death.[28] We held that to survive summary judgment, the estate needed to show evidence of a doctor's opinion that the aspiration caused the woman's pneumonia and that treating it earlier would have saved the woman's life

---

[25] *Id.*

[26] *See Punches v. McCarrey Glen Apartments, LLC*, 480 P.3d 612, 625 (Alaska 2021) (affirming grant of summary judgment against claim that exposure to mold caused health problems because plaintiff failed to obtain "proof beyond her personal belief" to "establish a connection between mold exposure and her alleged injuries including mucormycosis, a respiratory infection, bouts of skin abscesses, and chronic fatigue").

[27] 491 P.3d 1088, 1096-99 (Alaska 2021).

[28] *Id.*

because this theory of causation involved "causal connection[s] that [are] not commonly part of lay people's everyday experience."[29] But we reversed the superior court's grant of summary judgment because the treating physician's deposition testimony created a reasonable dispute of fact about causation.[30] Although the treating physician did not confidently opine that the aspiration was the cause of death and that earlier treatment would have saved the woman's life, the testimony, when viewed in the light most favorable to the estate, was sufficient evidence of causation to defeat summary judgment.[31]

Guilford opposed summary judgment with comparable evidence. She presented medical records that, when viewed in the light most favorable to her (as the non-moving party), indicate the opinion of a treating physician that mold exposure caused her health problems. These records, attributed to treating physicians Dr. Dolgonos and Dr. Rojas, are somewhat ambiguous. Under the heading "past medical history" appears the word "diagnosis," followed by a series of ailments like "anemia" and "borderline hypertension." Included in this list is "idiopathic angioedema *black mold at home 2015, symptoms disapear after moving to different house*" and "dizzy spells *Black mold angioedema caused* [everything sic]." It is not clear whether these statements indicate the physicians' belief about the likely cause of her ailments or merely record Guilford's own beliefs about causation. But drawing all inferences in favor of Guilford, as we must, these records can be viewed as showing the opinion of her treating

---

[29]    *Id.* at 1097.

[30]    *Id.* at 1097-98, 1098 n.52 (explaining that treating physicians can testify as "hybrid" witnesses, offering both personal knowledge of relevant facts and expert opinion testimony on causation).

[31]    *Id.*

physicians that her symptoms were caused by mold in her apartment.[32]  As in *Culliton*, that is enough to meet our "lenient standard" for withstanding summary judgment.[33]  We therefore reverse the superior court's order granting partial summary judgment on Guilford's personal injury claim to Weidner.

**B.**   **The Superior Court Did Not Err By Giving Preclusive Effect To The District Court's Finding That Guilford Offered To Pay Her Rent.**

The superior court ruled that the district court's finding that Guilford tried to pay her August 2015 rent was res judicata and allowed Guilford to present that fact to the jury.  Weidner concedes that the superior court likely meant to rely on the doctrine of collateral estoppel but maintains that the superior court misapplied that doctrine.  This error, Weidner suggests, undercut its ability to challenge Guilford's credibility, even though the superior court prohibited Guilford from arguing that the district court had found her more credible than Weidner.

We review applications of collateral estoppel de novo.[34]  Collateral estoppel, also known as issue preclusion, "prohibits a party from relitigating an issue of fact" and is appropriate when:

> (1) the party against whom the preclusion is employed was a party to or in privity with a party to the first action; (2) the issue precluded from relitigation is identical to the issue decided in the first action; (3) the issue was resolved in the first action by a final judgment on the merits; and (4) the determination of the issue was essential to the final

---

[32]   Weidner does not argue on appeal that these medical records or the statements in them are inadmissible evidence.

[33]   *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014) (quoting *Shaffer v. Bellows*, 260 P.3d 1064, 1069 (Alaska 2011)).

[34]   *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n, Inc.*, 152 P.3d 460, 465 (Alaska 2007).

judgment.[35]

Weidner argues that our decision in *Chilton-Wren v. Olds*[36] established that an FED hearing cannot give rise to a final judgment and appears to argue that the district court's finding was not essential to its final judgment, but does not challenge the other elements of collateral estoppel. Weidner misconstrues our holding. In that case we held that although "the FED hearing . . . was resolved by a final judgment," that final judgment extended only to the issue of possession and not the tenant's counterclaims.[37] A final judgment in an FED hearing therefore has preclusive effect only with respect to the factual findings essential to the ultimate issue of possession.[38]

Whether Guilford had tendered payment for her August 2015 rent was essential to the issue of possession and was the sole basis for the district court's denial of Weidner's action to evict her. The superior court did not err by giving preclusive effect to the finding that Guilford had indeed tendered that payment to Weidner.

## C. The Superior Court Did Not Err By Permitting Recovery Of Non-Economic Damages For Guilford's URLTA Claims.

URLTA assigns to landlords several duties regarding the condition of the premises including the duty to "make all repairs and do whatever is necessary to put and

---

[35] *Allstate Ins. Co. v. Kenick*, 435 P.3d 938, 944 (Alaska 2019) (quoting *Latham v. Palin*, 251 P.3d 341, 344 (Alaska 2011)).

[36] 1 P.3d 693 (Alaska 2000).

[37] *Id.* at 697-98.

[38] *Id.* ("Although Chilton-Wren was a party to the FED hearing which was resolved by a final judgment in her favor, her asserted claims for relief were not identical to the issues raised in the FED hearing; nor were they essential to the final judgment.").

keep the premises in a fit and habitable condition."[39] These duties are sometimes referred to as a warranty of habitability.[40] URLTA also contains a separate statutory provision authorizing the tenant to recover damages for the landlord's noncompliance with these duties.[41] Weidner argues that this remedy permits recovery of economic damages only and that the superior court erred by allowing the jury to award Guilford damages "for the discomfort, annoyance, and other mental and emotional distress she suffered from living in inadequate housing." Although this issue presents a close call, we conclude that URLTA permits recovery of non-economic damages for habitability violations.

Weidner argues that because URLTA's warranty of habitability reflects principles of contract and tort law,[42] its damages provision should be interpreted to incorporate the limitations on damages that exist in contract and tort actions at common law. In *Hancock v. Northcutt*, for example, we ruled that plaintiffs could not recover emotional distress damages in a breach of contract action against the builder of their

---

[39]    AS 34.03.100(a).

[40]    *See Newton v. Magill*, 872 P.2d 1213, 1217 (Alaska 1994) (describing development of implied warranty of habitability at common law and concluding that Alaska legislature "by adopting the URLTA has accepted the policy reasons on which the warranty of habitability is based").

[41]    AS 34.03.160(b).

[42]    *See McCall v. Fickes*, 556 P.2d 535, 537-38 (Alaska 1976) (observing that URLTA "accord[s] tenants previously unrecognized rights by recognizing the contractual nature of the landlord-tenant relationship"); *see also* Myron Moskovitz, *Implied Warranty of Habitability: A New Doctrine Raising New Issues*, 62 CAL. L. REV. 1444, 1471 (1974) (describing the implied warranty theory as "essentially a tort-contract hybrid concept").

custom home.[43] We recited the general rule that recovery of damages for emotional distress will be precluded for breach of contract unless the contract or breach was of a kind that would likely result in serious emotional distress.[44] We concluded that "breach of a house construction contract is not especially likely to result in serious emotional disturbance" because "[s]uch contracts are not . . . highly personal."[45] Weidner also points to the rule that damages for emotional distress are generally unavailable in tort unless physical injury occurs or the conduct meets the standards of intentional infliction of emotional distress.[46]

We are not persuaded that the legislature intended to enshrine these common law rules in URLTA's statutory remedy. To the contrary, we have emphasized the significant differences between the rights and remedies available in URLTA and those available at common law. In *Helfrich v. Valdez Motel Corp.* we held that URLTA and the common law of tort offer distinct rights and remedies.[47] Given the fundamental

---

[43]    808 P.2d 251, 258 (Alaska 1991).

[44]    *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 353 (AM. L. INST. 1981)).

[45]    *Id.* at 258.

[46]    *Id.* at 257-58. *But see* RESTATEMENT (SECOND) OF TORTS § 821D (AM. L. INST. 1979) (describing tort of "private nuisance" as "a nontrespassory invasion of another's interest in the private use and enjoyment of land"); *id.* cmt. b (explaining that "[f]reedom from discomfort and annoyance while using land is often as important to a person as freedom from physical interruption with his use or freedom from detrimental change in the physical condition of the land itself" and that this interest receives "much greater legal protection" than interest in freedom from emotional distress).

[47]    207 P.3d 552, 559 (Alaska 2009) (reasoning that Alaska's tort law, not URLTA, confers tenant's right to be free of landlord's negligence and remedy to recover damages for personal injuries).

differences between tort law and URLTA,[48] there is little reason to think the legislature intended to incorporate damages limitations from the common law of torts in URLTA's habitability provision. The same is true of contract law. The legislature went far beyond the common law by placing a wide array of mandatory duties upon both landlord and tenant, most of which cannot be contracted away.[49] Several of URLTA's damages go beyond making the tenant whole, such as by using a damages multiplier[50] or a penalty amount.[51] Moreover, even courts that have recognized the implied warranty of habitability as a contract theory have held that a tenant may recover damages for the annoyance and discomfort caused by breach of the warranty.[52] We therefore are not

_____

[48] *Id.* at 561 ("URLTA damages compensate tenants who live with conditions that render a dwelling unfit, uninhabitable, or unsafe, or who are constructively evicted by those conditions. Fault is irrelevant to such URLTA claims. Common law tort remedies compensate plaintiffs for consequential damages resulting from personal injury, including medical expenses, loss of employment or lack of income, and pain and suffering.").

[49] AS 34.03.040(a) (prohibiting rental agreement providing for waiver of rights or remedies under URLTA); *but see* AS 34.03.100(c) authorizing tenant to assume certain duties to maintain fit premises in rental unit for which rent exceeds $2,000 per month).

[50] *E.g.*, AS 34.03.070(d) (providing for damages of up to twice amount of security deposit unlawfully withheld); AS 34.03.210 (authorizing one and one-half times actual damages for unlawful ouster or deliberate interruption of essential services); AS 34.03.290(c) (authorizing landlord to recover one and one-half times actual damages if tenant remains unlawfully in possession).

[51] *E.g.*, AS 34.03.300 (authorizing award of actual damages or one month's period rent for landlord or tenant's violation of provisions governing landlord's right of access to dwelling).

[52] *Hilder v. St. Peter*, 478 A.2d 202, 209 (Vt. 1984) (holding that residential lease creates contractual relationship between landlord and tenant such that "standard
(continued...)

convinced that the legislature intended to import wholesale the common law of contract damages into URLTA.

Rather than parsing the common law to decide the scope of damages permitted for habitability violations, we must interpret the statute. When interpreting statutes, our goal "is to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[53] We consider the statute's text, legislative history, and purpose.[54]

Alaska's version of URLTA is patterned on the Uniform Residential Landlord & Tenant Act of 1972.[55] URLTA prescribes various duties for landlords and tenants, regarding payment of rent, security deposits, and control and condition of the premises. For each duty there is a corresponding remedy. The tenant's general remedy for the landlord's noncompliance with the rental agreement or the warranty of habitability provides: "Except as provided in this chapter, the tenant may recover damages and obtain injunctive relief for any noncompliance by the landlord with the

---

**52** (...continued)
contract remedies . . . are available to the tenant when suing for breach of the implied warranty of habitability," while also holding that damages should be allowed for tenant's discomfort and annoyance due to landlord's breach); *Teller v. McCoy*, 253 S.E.2d 114, 127-28 (W. Va. 1978) (explaining that although residential lease is a contract and "common law remedies for breach are applicable," courts have had "great difficulty formulating an appropriate measure of damages applicable to a breach of implied warranty" and ultimately concluding that tenant may recover damages for annoyance and discomfort).

**53** *City of Valdez v. State*, 372 P.3d 240, 254 (Alaska 2016) (quoting *City of Fairbanks v. Amoco Chem. Co.*, 952 P.2d 1173, 1178 (Alaska 1998)).

**54** *Ray v. State*, 513 P.3d 1026, 1033 (Alaska 2022).

**55** *Compare* AS 34.03.010 - .380, *with* UNIF. RESIDENTIAL LANDLORD & TENANT ACT §§ 1.101 - 6.104 , 7B U.L.A. 277-427 (1972).

rental agreement or AS 34.03.100 [warranty of habitability], 34.03.210 [unlawful ouster, exclusion, or diminution of service], or 34.03.280 [limits on landlord's recovery of possession]."[56] The text neither expressly authorizes non-economic damages nor expressly precludes them.

Other courts have reasoned, when construing their states' versions of the uniform act, that the measure of damages depends on the nature of the injury for which the legislature provided a remedy.[57] We agree with this methodology, while noting that textual differences between the various state versions of the uniform act have led courts to different conclusions about the scope of damages available. In Alaska the statutory warranty of habitability requires a landlord to do the following: maintain the premises in "a fit and habitable condition," including specifically to keep common areas "in a clean and safe condition"; make sure appliances, plumbing, and ventilation systems are in "good and safe working order"; ensure appropriate rubbish removal; and furnish adequate locks.[58] The landlord's failure to provide these things may in some cases lead the tenant to suffer physical harm. But in most cases the tenant's injury will be the

---

[56]     AS 34.03.160(b). The remedy for damages and injunctive relief is in addition to the tenant's right to terminate the rental agreement upon giving proper notice, provided for in AS 34.03.160(a).

[57]     *See Brewer v. Erwin*, 600 P.2d 398, 405-06 (Or. 1979) ("In short, when other statutory indicators are lacking, the key to damages seems to be to determine what kind of harm, in the setting of a normal residential rental transaction, can reasonably be said to lie within the contemplation of the protective provision of the act upon which the claim is founded."); *Thomas v. Goudreault*, 786 P.2d 1010, 1016 (Ariz. App. 1989) ("We agree with the *Brewer* court that the key to determining the type of 'damages' or 'actual damages' contemplated under the Act is to determine the type of harm in the setting of a normal residential rental transaction that can reasonably be said to lie within the contemplation of the protections afforded by the Act.").

[58]     AS 34.03.100(a).

discomfort, disgust, and stress of living in a filthy, uncomfortable, or unsafe residence.

> Generally, the residential tenant who has suffered a breach of the warranty does not lose money. [Tenants] cannot bathe as frequently as [they] would like or at all if there is inadequate hot water; [tenants] must worry about rodents harassing [their] children or spreading disease if the premises are infested; or [they] must avoid certain rooms or worry about catching a cold if there is inadequate weather protection or heat. Thus discomfort and annoyance are the common injuries caused by each breach and hence the true nature of the general damages the tenant is claiming.[59]

Because discomfort, annoyance, and mental stress are the common and foreseeable harms caused by habitability violations, it stands to reason that the legislature did not intend to preclude damages for these kinds of harms. Of course, some tenants may be able to use their own resources to cure minor problems and could claim those expenses as economic damages. But because tenants do not own the premises, their ability to fix the problem will often be limited.[60] And if economic harm is the only measure of damages recoverable, then only those tenants with the financial means to protect themselves will have a remedy. Interpreting the act in a way that offers no remedy for many violations or for the most vulnerable tenants would go against the statute's express command that it "be liberally construed and applied" to "encourage landlord and tenant to maintain and improve the quality of housing."[61]

---

[59]    *See* Moskovitz, *supra* note 42, at 1470-71.

[60]    It is notable that the Alaska Legislature did not adopt a provision from the uniform act that would allow the tenant to fix minor habitability problems and deduct the cost of the repair from the rent. *Cf.* UNIF. RESIDENTIAL LANDLORD & TENANT ACT § 4.103. In Alaska, the only remedy for a tenant who repairs minor habitability defects is to sue for damages.

[61]    AS 34.03.010(a)–(b); *see also Newton v. Magill*, 872 P.2d 1213, 1217
(continued...)

To interpret the measure of damages allowed by AS 34.03.160, we must also consider the entire statutory scheme, in particular the many other remedies provided by URLTA.[62] For example, the landlord has an almost mirror-image general remedy to recover "actual damages and obtain injunctive relief for any noncompliance by the tenant with the rental agreement or AS 34.03.120 [tenant's obligations]."[63] Weidner points out that the landlord's general remedy is worded slightly differently than the tenant's: the landlord may recover "actual damages" while the tenant may recover "damages."[64] The term "actual damages" does not distinguish between economic and non-economic damages, but between "proven injury or loss" and exemplary damages such as punitive

---

**61** (...continued)
(Alaska 1994) (construing URLTA to abolish landlord tort immunity, relying on the "policy reasons on which [URLTA's] warranty of habitability is based" and explaining that "it would be inconsistent with a landlord's continuing duty to repair premises imposed under . . . URLTA to exempt from tort liability a landlord who fails in this duty"); *Vinson v. Hamilton*, 854 P.2d 733, 736 (Alaska 1993) (construing URLTA to broadly apply to month-to-month tenants because "[o]therwise, these tenants would not assert their rights under their leases and under the law, rightfully fearful that landlords would evict them in consequence," a result that "would frustrate public policy").

**62** *See City of Valdez v. State*, 372 P.3d 240, 249 (Alaska 2016) ("Because the term 'assessment' is used throughout AS 43.56's statutory scheme, an outline of the language set forth in the statutory scheme will prove helpful . . . .").

**63** AS 34.03.220(c).

**64** *Compare* AS 34.03.160(b) (permitting tenant to recover "damages . . . for any noncompliance by the landlord with the rental agreement or AS 34.03.100, 34.03.210, or 34.03.280"), *with* AS 34.03.220 (permitting landlord to recover "actual damages . . . for any noncompliance by the tenant with the rental agreement or AS 34.03.120").

damages or treble damages.[65]  Because the tenant's general remedy in AS 34.03.160(b) incorporates the right to obtain exemplary damages (one and one-half times actual damages) for unlawful ouster and the landlord's willful diminution of essential services,[66] the legislature likely used the term "damages" in AS 34.03.160(b) to encompass both actual and exemplary damages.  The slightly different wording does not shed any light on the kinds of injury that the legislature intended to compensate.[67]

More illuminating is a comparison between the tenant's general remedy for habitability violations, AS 34.03.160(b), and the special remedy for wrongful failure to supply essential services, AS 34.03.180.  The latter statute provides special remedies for what can be viewed as the most serious kind of habitability violations:  deliberate or

---

[65]  *See actual damages*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "actual damages" as "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses").

[66]  AS 34.03.160(b); AS 34.03.210; AS 34.03.280.

[67]  Weidner's brief does not expressly argue that the twin damages remedies for landlords and tenants should be interpreted to allow the same types of damages, but it is a fair point to consider.  The Oregon Supreme Court, interpreting Oregon's version of URLTA, observed:

> [T]he positions of the parties to a residential tenancy are only superficially symmetrical.  From the landlord's standpoint a rental is ordinarily a business transaction.  Allowing for differences among tenants that may make one preferable to another, their rental payments are fungible.  From the tenant's viewpoint, the transaction involves his or her home and personal life.

*Brewer v. Erwin*, 600 P.2d 398, 405 (Or. 1979).  Yet the court also recognized that these generalizations were not "invariably true" and that the statute provided damages to landlord and tenant in "identical terms."  *Id.*  It ultimately did not opine on whether the damages remedies were identical.  Because the scope of a landlord's damages under AS 34.03.120 is not an issue raised in this case, we express no opinion on the matter either.

negligent failure "to supply running water, hot water, heat, sanitary facilities, or other essential services."[68]  In those cases, after giving notice to the landlord, the tenant may immediately procure those services and deduct "their actual and reasonable cost from the rent."[69] Alternatively, the tenant may procure reasonable substitute housing; the tenant is then excused from paying rent and may also recover the amount by which the cost of substitute housing exceeds the rent.[70]  Or as another alternative, the tenant may "recover damages based on the diminution in the fair rental value of the dwelling unit."[71]  Yet this statute also contains a limitation:  "A tenant who proceeds under this section may not proceed under AS 34.03.160 as to that breach."[72]  In other words, a tenant who elects one of the special remedies for wrongful failure to supply essential services may not also recover the damages authorized by AS 34.03.160.[73]

---

[68]    AS 34.03.180(a).

[69]    AS 34.03.180(a)(1).

[70]    AS 34.03.180(a)(3).

[71]    AS 34.03.180(a)(2).

[72]    AS 34.03.180(b).

[73]    Like URLTA, the Uniform Law of 1972 provides for diminution in fair market value only for failure to supply essential services. See UNIF. RESIDENTIAL LANDLORD & TENANT ACT § 4.104, 7B U.L.A. 386-390 (1972).  It is notable that the Revised Uniform Residential Landlord and Tenant Act, adopted in 2015, no longer designates diminution in fair market value as a remedy exclusively for denial of essential services. See REV. UNIF. RESIDENTIAL LANDLORD & TENANT ACT § 407(a), 7B U.L.A. 227 (2015) (providing that when landlord denies essential services, tenant may either procure service and deduct cost or obtain substitute housing).  Instead the 2015 version of the uniform act expressly makes diminution in fair market value of the dwelling a nonexclusive measure of damages available for all habitability violations.  Id. § 402 (providing that if landlord's noncompliance with duty to maintain fit premises causes
(continued...)

These special remedies are framed in economic terms: the cost of procuring the essential service; the cost of substitute housing; or the diminution in fair market value. Yet it is important to keep in mind that they are alternative remedies that entail tradeoffs. The self-help remedies make it easier for the tenant to obtain immediate relief without the delay and uncertainty of litigation, yet the tenant may not recover all consequential damages. Similarly, the diminution-in-fair-market-value remedy relieves the tenant of the burden to prove the specific consequential damages suffered, but because it is an objective measure of harm rather than a measure of the tenant's personal injury, the tenant may not be made whole.[74] Thus the provisions of AS 34.03.180 suggest legislative intent to provide a wider range of remedies for the most serious habitability violations, rather than intent to limit the general measure of damages to economic harms only.

The legislature also used diminution in value in AS 34.03.190, which authorizes the court to abate rent when the tenant asserts a habitability counterclaim to an FED action based on nonpayment of rent. In *Chilton-Wren v. Olds* we held that a tenant who sought this remedy as a defense to eviction for nonpayment was not

---

[73]    (...continued)
denial of essential service, materially interferes with health or safety, or materially interferes with "use and enjoyment" of premises, tenant may recover "actual damages"); § 102 (defining "actual damages" to include "diminution in the value of a dwelling unit"). The changes to the 2015 version of the uniform act seem to underscore the limited availability of diminution in fair market value damages in the original version of the uniform act and, consequently, in Alaska's version of URLTA.

[74]    *See Teller v. McCoy*, 253 S.E.2d 114, 128 (W. Va. 1978) ("We feel that the true nature of the damages suffered by a tenant faced with a breach by the landlord of the warranty are not adequately measured by the exclusive use of the 'difference in value' standard."); *Hilder v. St. Peter*, 478 A.2d 202, 209 (Vt. 1984) (holding that tenant faced with breach of implied warranty of habitability may recover diminution of fair market value or damages for discomfort and annoyance).

collaterally estopped from later recovering damages for habitability violations.[75]  We explained that the purpose of raising counterclaims under AS 34.03.190 to the FED action is to show that the tenant's damages claim is at least as valuable as the rent owed, which would be a successful defense to eviction based on nonpayment of rent.[76]  The statute authorizes the use of diminution in fair market value as an objective measure of harm to the tenant, enabling the court to compare which party is owed more in a quick way appropriate to the "uniquely expedited" FED process.[77]  The tenant may later prove the damages she has actually suffered through a damages action under AS 34.03.160.[78]  Therefore the legislature's use of diminution in fair market value in AS 34.03.190 reflects an alternative measure of damages for special circumstances, as in AS 34.03.180.

In sum, URLTA's remedy structure provides for a general remedy for the landlord's noncompliance with the warranty of habitability and alternative special remedies for failure to provide essential services and for calculating the parties' debts to one another in summary eviction proceedings.  This structure, with the alternative remedies measured in economic terms only, suggests that the legislature intended a broader measure of damages under AS 34.03.160(b)'s general remedy.

Ultimately, without a clear indication of legislative intent for whether

---

[75]     1 P.3d 693, 695, 698 (Alaska 2000) (noting that tenant claimed no rent was due in part because landlord violated statutory obligation to maintain safe and habitable premises).

[76]     *Id.* at 698.

[77]     *Id.*

[78]     *Id.* (explaining that absent agreement to fully litigate tenant's counterclaims in FED proceeding, "the proper approach is to bifurcate the trials — litigating the counterclaims in the FED action only to the extent necessary to determine the question of possession and preserving the damages issues for a later jury trial").

URLTA permits recovery of non-economic damages, we must fall back on its command to construe URLTA liberally to effectuate its purpose.[79] As explained above, economic damages are not the primary measure of the injury caused by habitability violations. And limiting recovery to economic damages only would preclude recovery for many habitability violations that do not amount to denial of essential services. Construing AS 34.03.160(b) to permit recovery of non-economic damages for habitability violations appears more consistent with the legislature's remedial intent.

Weidner relies on the Oregon Supreme Court's decision in *Brewer v. Erwin*, which held that although non-economic damages are available for habitability violations under Oregon's version of URLTA, they can be recovered only when the landlord's conduct was "deliberate, willful, retaliatory, or malicious."[80] The court noted that under Oregon law, damages based on diminution of fair market value were available only when the landlord deliberately refused or was grossly negligent in failing to provide essential services, but not for mere negligence.[81] It reasoned that the legislature

---

[79]   AS 34.03.010.

[80]   600 P.2d 398, 409 (Or. 1979).  Weidner also relies on decisions from Colorado and Pennsylvania, but these are not on point.  In *Blackwell v. Del Bosco* there was no statutory or common law warranty of habitability in Colorado law, and the court rejected a claim for emotional distress damages on the ground that the landlord's conduct failed to satisfy the standards for intentional infliction of emotional distress.  536 P.2d 838, 840-41 (Colo. App. 1975).  In *Fair v. Negley* a Pennsylvania court rejected the argument that "breach of the implied warranty of habitability constitutes intentional infliction of emotional distress as a matter of law" but did allow the tenant to try to prove that the landlord, "by breaching the warranty, has intentionally inflicted emotional distress upon the appellants." 390 A.2d 240, 246 (Pa. Super. 1978).  Neither decision addressed whether a statutory remedy for violating the warranty of habitability allows recovery of non-economic damages.

[81]   *Brewer*, 600 P.2d at 406.

"differentiated the gravity of a landlord's breaches" in two respects: between essential services and other required services, and between culpable or negligent conduct.[82] In light of this distinction, it concluded that damages for actual psychological harm suffered would be appropriate only for deliberate conduct.[83]

We decline to follow the *Brewer* decision because Alaska law does not draw the same distinctions. Under Alaska law the special remedies for failure to supply essential services are available for both negligent and deliberate conduct.[84] Alaska law punishes deliberate failure to supply essential services by authorizing a tenant to recover one and one-half times actual damages.[85] Thus the degree of culpability in the landlord's conduct does not support a distinction in the type of injury that may be compensated with damages; Alaska law punishes more culpable conduct with a damages multiplier. And as explained above, although AS 34.03.180's alternative remedies indicate the Alaska Legislature intended to make more remedies available for the most serious habitability violations, it does not suggest an intent to *limit* the kinds of damages tenants may recover for habitability violations.[86]

---

[82]    *Id.* at 409.

[83]    *Id.*

[84]    AS 34.03.180(a) ("If, contrary to . . . AS 34.03.100, the landlord deliberately or negligently fails to supply running water . . . or other essential services . . . .").

[85]    AS 34.03.210 ("If the landlord . . . willfully diminishes services to the tenant by interrupting or causing the interruption of electric, gas, water, sanitary or other essential service to the tenant, the tenant may . . . recover an amount not to exceed one and one-half times the actual damages.").

[86]    *See Thomas v. Goudreault*, 786 P.2d 1010, 1016 (Ariz. App. 1989) (rejecting rationale of *Brewer* decision and holding that Arizona's version of URLTA
(continued...)

Weidner also argues that permitting a tenant to recover non-economic damages for habitability violations is contrary to URLTA's statutory purpose to "simplify, clarify, modernize, and revise the law governing the rental of dwelling units"[87] because it will bog down resolution of these claims. We disagree: allowing recovery of non-economic damages does not make the *law* complex or unclear, even if it may expose landlords to more litigation and greater liability. Concern over landlords' liability exposure is reasonable, but should not be overstated. URLTA gives "[t]he aggrieved party . . . a duty to mitigate damages."[88] For all habitability violations materially affecting health and safety, the tenant may terminate the tenancy after 20 days if the problem is not promptly fixed.[89] Although not all tenants will be in a position to terminate the tenancy and move so quickly, the tenant's right to do so is a consideration in deciding whether the tenant has mitigated damages, including non-economic damages allegedly resulting from the unfit dwelling. And of course, the landlord can reduce liability for noneconomic damages due to habitability violations by promptly correcting them, which is one of the main policy goals behind URLTA's adoption.

Because URLTA permits recovery of non-economic damages for habitability violations, the superior court did not err by allowing the jury to award Guilford damages for the discomfort, annoyance, and mental distress attributable to Weidner's violations of the warranty of habitability.

---

**86** (...continued)
permits recovery of emotional distress damages even when landlord's habitability violations are not "culpable").

**87** AS 34.03.010(b)(1).

**88** AS 34.03.320.

**89** AS 34.03.160(a).

**D. The Superior Court Did Not Abuse Its Discretion In Evidentiary Rulings.**

Weidner appeals a number of evidentiary rulings. We review the superior court's evidentiary rulings for abuse of discretion, reversing only if the error is "inconsistent with substantial justice."[90]

**1. The superior court did not abuse its discretion by permitting other Weidner tenants to testify.**

Weidner argues that the superior court erred when it admitted testimony from other tenants in the building. It asserts that the testimony was not relevant, was overly prejudicial, and constituted impermissible character evidence.

Evidence is relevant, and therefore assumed admissible, if it has "any tendency to make the existence of any fact . . . of consequence . . . more probable or less probable than it would be without the evidence."[91] Guilford's complaints included plumbing issues, mold, and rodents, all of which were likely to affect other tenants and other units in her building. The superior court reasonably concluded their testimony was relevant because habitability is a "broad subject" and witnesses should be able "to testify about conditions that [they] observed in the Weidner Apartment Complex that . . . affected habitability of the unit." And each of the other tenants testified to at least one of the same problems Guilford alleged.

Weidner contends that the other tenants' testimony was unfairly prejudicial and was impermissible evidence of Weidner's "corporate character." Evidence of specific bad acts "is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity

---

[90]    *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016) (quoting *Loncar v. Gray*, 28 P.3d 928, 930 (Alaska 2001)).

[91]    Alaska R. Evid. 401.

therewith."[92]  But such evidence is admissible to show, among other things, "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[93]  When considering this evidence, "the superior court must weigh the undue prejudice of the character inference against any probative value the evidence has for a permissible purpose under [Alaska Evidence] Rule 403."[94]  "We will not reverse a superior court's balancing under this test unless convinced the 'potential danger predominated so greatly' as to constitute a clear abuse of discretion."[95]

The tenants' testimony that they reported their issues to Weidner is admissible to establish that Weidner had knowledge of the issues and an opportunity to remedy them.  Weidner's knowledge of the issues was also essential to prove Guilford's retaliatory eviction claim.  Any prejudice Weidner may have suffered as a result of this testimony was at least partially offset by its opportunity to cross-examine these tenants, which elicited favorable evidence about its performance as a landlord.  The superior court did not abuse its discretion by permitting Guilford's neighbors to testify about the conditions of the Weidner building.

### 2. The superior court did not abuse its discretion by excluding late-disclosed witnesses, photographs, and video.

Weidner also argues the superior court abused its discretion when it

---

[92]   Alaska R. Evid. 404(b)(1).

[93]   *Id.*

[94]   *Lindbo v. Colaska, Inc.*, 414 P.3d 646, 656 (Alaska 2018); *see also* Alaska R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

[95]   *Id.* at 656 (quoting *Jones v. Bowie Indus., Inc.*, 282 P.3d 316, 324 (Alaska 2012)).

excluded three Weidner maintenance employees as witnesses and refused to admit 300 photographs and a video of Guilford's apartment that it reportedly found the Friday before trial. The witnesses were not on Weidner's preliminary witness list and were named only on its final witness list 15 days before trial.[96] The superior court granted Guilford's motion to exclude the witnesses, noting that "[t]he failure to identify these multiple witnesses until the last minute, coupled with the eve-of-trial disclosure of over 300 photographs [and a video], paints an unflattering picture of disregard for the pretrial order, the rules of discovery, and fair play." Weidner claims the court's ruling was an abuse of discretion because Weidner complied with the court's only order requiring a witness list, because its late disclosures were harmless, and because the court failed to recognize how its ruling would prejudice Weidner.

The civil rules impose an ongoing obligation to supplement a party's discovery disclosures. Alaska Civil Rule 26 requires parties to disclose the name and contact information of any proposed witnesses they expect to call[97] and imposes a duty to supplement disclosures if they are "incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."[98] Alaska Civil Rule 37(c) generally requires the trial court to "exclude undisclosed evidence unless there is substantial justification for the party's failure to make timely disclosure and this failure is harmless."[99] The court "has broad discretion in imposing sanctions respecting Rule 26(e), as it does under Rule

---

[96] Although Weidner appeals only the exclusion of 3 witnesses, it actually named 11 previously undisclosed witnesses in its final witness list.

[97] Alaska R. Civ. P. 26(a)(3).

[98] Alaska R. Civ. P. 26(e)(1).

[99] *Adkins v. Collens*, 444 P.3d 187, 202 (Alaska 2019).

37, and its decision in these matters will only be overturned upon an abuse of discretion."[100]

Weidner argues that its late disclosures were harmless because the potential witnesses were discussed during depositions and "identified as Weidner employees with knowledge of [Guilford's] unit." Acknowledging in a deposition that these individuals were employed by Weidner, however, did not notify Guilford that Weidner intended to call them as witnesses and did not provide her with their contact information as required by Rule 26. Weidner's late disclosure was neither justified nor harmless. The superior court did not abuse its discretion by excluding the late-disclosed witnesses.

Weidner argues that the superior court also abused its discretion by excluding the hundreds of photographs it claims to have discovered the Friday afternoon before the Tuesday trial. Weidner claims the court automatically assumed admitting the photographs would be prejudicial. Rule 37's requirements regarding the late-disclosed photographs and video are the same as those regarding its late-disclosed witnesses.[101] Weidner's only justification was that the photographs were in "an electronic file, you know, sitting there on the — on the computer with an awful lot of other electronic files." The court ruled that the photographs and video were cumulative and the discovery violation was "significant" and "materially prejudicial to [Guilford]." The superior court did not abuse its discretion and its exclusion of the photographs and evidence was not

---

[100] *Grimes v. Haslett*, 641 P.2d 813, 822 (Alaska 1982) ("[T]he trial court has inherent power to exercise this authority.").

[101] *See* Alaska R. Civ. P. 37(c)(1) (mandating that party "shall not . . . be permitted to use" undisclosed evidence unless there is showing of substantial justification and harmlessness); *see also Adkins*, 444 P.3d at 202.

"inconsistent with substantial justice."[102]

###   3.  The superior court did not abuse its discretion by admitting government publications about the hazards of mold.

Weidner argues that the superior court improperly admitted three publications from OSHA, EPA, and DHSS. The court ruled they were admissible under the public records exception to the hearsay rule.[103]

Weidner cites no legal authority and fails to adequately develop its arguments on appeal, generally complaining the evidence was irrelevant and prejudicial. But Weidner never explains how the mold safety documents were irrelevant or prejudicial. "[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal."[104] Weidner has waived this argument through inadequate briefing on appeal, and we do not address it.[105]

### E.  The Superior Court Did Not Err By Denying A Directed Verdict On Intentional Misrepresentation.

Weidner argues it was entitled to a directed verdict on Guilford's claim of intentional misrepresentation. "We have identified the elements of intentional misrepresentation as '(1) a misrepresentation of fact or intention, (2) made fraudulently (i.e., with scienter), (3) for the purpose of inducing another to act in reliance, (4) with

---

[102]   *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016) (quoting *Loncar v. Gray*, 28 P.3d 928, 930 (Alaska 2001)).

[103]   *See* Alaska R. Evid. 803(8)(a).

[104]   *Windel v. Carnahan*, 379 P.3d 971, 980 (Alaska 2016) (quoting *Adamson v. Univ. of Alaska*, 819 P.3d 886, 889 n.3 (Alaska 1991)).

[105]   *See Hagen v. Strobel*, 353 P.3d 799, 805 (Alaska 2015).

justifiable reliance by the recipient, (5) causing loss.' "[106]  Weidner argues that Guilford failed to offer "evidence of intentionality."  We review a grant or denial of a motion for a directed verdict de novo, deciding "whether the evidence, when considered in the light most favorable to the nonmoving party, is such that reasonable persons could not differ in their judgment."[107]

Guilford's claim for intentional misrepresentation was based on an administrative fee Weidner charged its tenants to pay their electric bill through Weidner. Guilford testified at trial that Weidner told her this fee would be $15 per month but secretly raised the fee to $25 and then $50 per month.  A Weidner employee testified that he had written a letter notifying Guilford of the fee and did not intentionally misrepresent the existence of the fee.  On cross-examination, the same witness testified that he thought he had added the fee to Guilford's 2015 lease, but was not able to identify the fee when shown the lease.  Guilford denied receiving any letter from Weidner notifying her of the increased fee.

The court denied Weidner's motion for a directed verdict, concluding it was "the jury's job, not the Court's, to weigh the evidence, evaluate the credibility of the witnesses, and decide who's right."  It reasoned that "[n]obody from Weidner has admitted that they were committing fraudulent misrepresentations, but inferences can be

---

[106]    *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Motors Corp.*, 221 P.3d 977, 987-88 (Alaska 2009) (quoting *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp.*, 129 P.3d 905, 914 (Alaska 2006)).

[107]    *Todeschi v. Sumimoto Metal Mining Pogo, LLC*, 394 P.3d 562, 570 (Alaska 2017) (quoting *Noffke v. Perez*, 178 P.3d 1141, 1144 (Alaska 2008)); *see also Taylor v. Wells Fargo Home Mortg.*, 301 P.3d 182, 191 (Alaska 2013) (quoting *Cameron v. Change-Craft*, 251 P.3d 1008, 1017 (Alaska 2011)) (reviewing denial of directed verdict by asking "whether the evidence, and all reasonable inferences which may be drawn from the evidence, viewed in the light most favorable to the non-moving party, permits room for diversity of opinion among reasonable jurors").

drawn from the party's conduct."

Viewing the evidence in the light most favorable to Guilford, it was enough to present the question of misrepresentation to the jury. In other contexts we have held that elements such as fraud and intent can be inferred from circumstantial evidence.[108] In this case a reasonable jury could, and did, conclude that Guilford was more credible than Weidner's employee and that Weidner's actions were intentional. The superior court did not err by denying a directed verdict on intentional misrepresentation.

**F.      The Superior Court Did Not Err By Ruling That Guilford's Personal Injury Claim Is A Tort Claim Rather Than A URLTA Claim When Awarding Attorney's Fees.**

The superior court partially granted Guilford's motion for attorney's fees, ruling that she was the prevailing party but awarding her far less than the six-figure sum she requested. Both parties appeal the attorney's fee award. Because the award is premised on the dismissal of Guilford's personal injury claim, which we reverse, the award must be vacated. Yet we address Guilford's arguments pertaining to the fee award because the issues she raises will remain salient regardless of who prevails on remand.[109]

The superior court decided that Guilford was the prevailing party but obtained a decidedly "mixed" result, with her personal injury claim dismissed on

---

[108]    *See, e.g.*, *Gransbury v. United Bldg. Supply, Inc.*, 531 P.2d 1247, 1249 (Alaska 1975) (inferring intent to hinder, delay, or defraud from party's conduct).

[109]    Weidner argues on cross-appeal that the superior court erred by declaring Guilford the prevailing party. Because we vacate the attorney's fee award and remand for further proceedings, which may affect the court's determination of which party is the prevailing party, we decline to address this argument on appeal. By contrast, the questions of whether (1) Guilford's personal injury claim is subject to URLTA's attorney's fee provision and (2) Guilford's attorney's fee award should be discounted due to modest recovery on her URLTA claims will remain regardless of how the proceedings on remand unfold. We therefore address them here.

summary judgment and her URLTA claims yielding only $7,325 in damages after years of litigation. Reasoning that URLTA's attorney's fee provision, which entitles the prevailing party to full reasonable fees,[110] should not apply to Guilford's personal injury claim, the court adopted a "blended analysis." It started with the total sum of attorney's fees Guilford incurred ($112,461), then subtracted: (1) the portion of the fees she incurred in pursuit of the unsuccessful personal injury claim ($32,265); and (2) the amount of attorney's fees the court awarded Weidner under Civil Rule 82 for successfully defending the personal injury claim ($34,589.20).[111] The court deemed the resulting figure, $45,606.80, an unreasonable amount of fees because of the "vast disparity" when compared with the actual award of damages. While recognizing that URLTA's full fee provision is intended to create sufficient incentive to ensure legal representation for tenants, the court also reasoned that the provision "should not be applied as if it were a guarantee of full employment for lawyers." Therefore it reduced the figure by half, resulting in an attorney's fee award of $22,803.40. On appeal, Guilford argues that the superior court erred by applying Civil Rule 82 and by reducing her award further in light of her modest monetary recovery.

The superior court did not err by applying Rule 82 to Guilford's personal injury claim because that claim is not governed by URLTA. URLTA's fee-shifting provision permits the "prevailing party in any proceeding arising out of [URLTA] or a

---

[110] AS 34.03.350; *Dawson v. Temanson*, 107 P.3d 892, 897 (Alaska 2005).

[111] The superior court awarded Weidner 80% of its fees incurred in defense of this claim, higher than the presumptive percentage of fees under Civil Rule 82, because it deemed Guilford's pursuit of the personal injury claim to lack a reasonable basis. *See* Alaska R. Civ. P. 82(b)(3)(G) (authorizing court to vary presumptive award due to "vexatious or bad faith conduct").

rental agreement" to recover full, reasonable fees.[112]  This provision controls the award of fees with respect to claims properly stated under URLTA.  Yet the claim of a tenant who seeks damages for injuries resulting from conditions on the premises does not "aris[e] out of" URLTA, even if it is pled as a URLTA claim (as Guilford did here).  It arises out of the common law of torts.[113]

Our decision in *Helfrich* distinguished personal injury claims based on premises conditions from URLTA habitability claims.  In that case we considered whether the plaintiff could invoke the protection of URLTA's anti-retaliation provision when he was evicted after threatening to sue his landlord in tort for injuries caused by a slip and fall on the premises.[114]  URLTA prohibits retaliation against a tenant who has "sought to enforce rights and remedies granted the tenant under this chapter."[115]  We concluded that a suit for personal injury was not one of the "rights and remedies" granted

---

[112]  AS 34.03.350; *Dawson*, 107 P.3d at 897.

[113]  Despite the fundamental difference between a URLTA claim and a tort claim based on premises conditions, the duties URLTA imposes on the landlord may be relevant in defining the duty of care applicable to a personal injury claim based on premises conditions.  In *Ass'n of Vill. Council Presidents v. Mael* we held that a housing authority's contractual agreement to perform home safety inspections — which were grounded in federal regulation — could be the basis for a tort claim based on the negligent performance of those inspections.  507 P.3d 963, 974 (Alaska 2022) (explaining that housing authority "undertook to render a service . . . necessary for the protection" of persons in homeowner's household and could "therefore be liable to those other persons for physical harm resulting from its failure to exercise reasonable care to perform its undertaking").  We then looked to the terms of the contract and regulations to define the scope of the defendant's duty.  *Id.* at 976-78.  URLTA's warranty of habitability may work in similar fashion to define the landlord's duty in a personal injury claim based on premises conditions.

[114]  *Helfrich v. Valdez Motel Corp.*, 207 P.3d 552, 558-62 (Alaska 2009).

[115]  AS 34.03.310(a).

by URLTA and therefore did not trigger its anti-retaliation provision.[116] In reaching this conclusion, we suggested that tort law provides the sole avenue for tenants to state personal injury claims, even when these claims stem from habitability or fitness issues:

> [R]emedies for a landlord's noncompliance with URLTA generally relate to habitability or fitness disputes. URLTA damages compensate tenants who live with conditions that render a dwelling unfit, uninhabitable, or unsafe, or who are constructively evicted by those conditions. Fault is irrelevant to such URLTA claims. Common law tort remedies compensate plaintiffs for consequential damages resulting from personal injury, including medical expenses, loss of employment or lack of income, and pain and suffering.[117]

In other words, URLTA created a damages action for a different kind of injury, governed by different standards, than a common law tort action, which provides a remedy for personal injury. Although a different passage in *Helfrich* could be read to suggest otherwise,[118] the passage quoted above, the logic of the decision, and the dissent's description of the court's holding all indicate that personal injury claims based on premises conditions are not URLTA claims.[119]

Our decision in *Newton v. Magill* further supports this distinction between

---

**116** *Helfrich*, 207 P.3d at 561-62.

**117** *Id.* at 561 (footnote omitted).

**118** *See id.* at 559 (" . . . URLTA does not expressly grant the tenant a right to be free from the landlord's negligence or a remedy to recover consequential damages for personal injuries resulting from such negligence if fitness and habitability are not in issue."). In isolation, this sentence could be read to suggest that URLTA gives the tenant a remedy to recover these damages if fitness and habitability *are* "in issue."

**119** *See id.* at 564 (Winfree, J., dissenting) (explaining that under court's interpretation of URLTA's anti-retaliation statute, tenant may invoke its protection for complaining about an unsafe stairwell but may not invoke its protection by filing a suit for damages if child is injured on unsafe stairwell).

habitability claims under URLTA and personal injury claims based on premises conditions. In *Newton* we abrogated landlords' common law immunity against personal injury claims.[120] We reasoned that this immunity, based on the ancient principle of *caveat emptor*, was inconsistent with the legislative policies underlying URLTA, which imposes a duty on the landlord to repair.[121] If URLTA itself permitted recovery of damages for personal injury, it would not have been necessary to abolish landlords' immunity from personal injury claims because tenants could seek damages under URLTA instead. We also emphasized the distinction between URLTA claims and tort claims, rejecting the claimant's argument that landlords should be strictly liable and holding that a "customary negligence analysis" applies to personal injury claims based on premises conditions.[122]

Claimants cannot avoid the common law rules applicable to negligence claims (like the need to show fault) by pleading a personal injury claim as if it were a URLTA claim. The superior court did not err by distinguishing Guilford's personal injury claim from her URLTA claim and applying Rule 82's provisions to the former when calculating the attorney's fee award.[123]

---

[120] *Newton v. Magill*, 872 P.2d 1213, 1217 (Alaska 1994).

[121] *Id.* at 1216-17.

[122] *Id.* at 1218 & n.6.

[123] Distinguishing between the nature of the claims is only one step in properly awarding attorney's fees when more than one fee regime is involved. To properly allocate attorney's fees, the parties and superior court must also distinguish which fees were incurred on which claims. The superior court correctly recognized the need to do so. It deducted from Guilford's total claimed fees "the portion of fees attributable to work on the personal injury claim" and then deducted an additional figure based on the fees incurred by Weidner "defending against the bodily injury claim." Yet given the

(continued...)

Finally, we address the superior court's decision to reduce Guilford's attorney's fee award due to the "vast disparity" between the fees incurred and her damages recovery. The court observed that URLTA provides for recovery of attorney's fees to give lawyers incentive to represent tenants but reasoned that the provision "should not be applied as if it were a guarantee of full employment for lawyers."

Courts have authority under URLTA to determine whether the amount of fees incurred is reasonable[124] but must be careful to use the proper benchmark. Damages awards for habitability violations and other violations of URLTA will usually be modest. For example, even if the landlord fails to provide heat in the dead of winter and the tenant has to move out and procure substitute housing, the damages will rarely be more than several thousand dollars.[125] Claims of improperly withheld security deposits will

---

[123]    (...continued)
factual overlap between Guilford's URLTA habitability claim (on which she prevailed) and her personal injury claim, it is unclear how the court allocated the fees related to both claims. Guilford did not raise this point of allocation on appeal. Because we vacate the attorney's fee award, the superior court will again have to address the problem of fee allocation regardless of who ultimately prevails on the personal injury claim. *See, e.g.*, *Manning v. State, Dept. of Fish & Game*, 355 P.3d 530, 540 (Alaska 2015) (holding that under statute precluding award of attorney's fees incurred in defense of non-frivolous constitutional claims, superior court could not award attorney's fees incurred on procedural issues absent documentation that procedural issue was "related solely to a non-constitutional claim"); *see also Meyer v. Stand for Salmon*, 450 P.3d 689, 691 (Alaska 2019) (Winfree, J., concurring) (explaining that constitutional claimants are entitled under AS 09.60.010 "to recover attorney's fees devoted in any reasonably connected way to the constitutional claims on which [they] prevailed" while prevailing defendants "should be entitled to appropriate awards of non-statutory attorney's fees against claimants for any work devoted solely to non-constitutional claims").

[124]    *Dawson v. Temanson*, 107 P.3d 892, 897 (Alaska 2005).

[125]    *E.g.*, AS 34.03.180(a)(3) (providing that when landlord fails to provide
(continued...)

often yield less than that.[126]  And attorneys' time is expensive, meaning that tenants' monetary recovery will most often pale in comparison to their attorney's bills. Discounting an award of attorney's fees under URLTA because the attorney worked inefficiently or acted vexatiously may be appropriate.  But discounting an attorney's fee award *solely* because the tenant's monetary recovery is modest undermines the apparent policy behind URLTA's full-fee provision: to give lawyers financial incentive to represent parties with meritorious URLTA claims when financial incentives are otherwise lacking.  For that reason the superior court's decision to discount Guilford's attorney's fee award by 50% due solely to the large disparity between her damages recovery and the fees award was error.

## V.    CONCLUSION

We REVERSE the superior court's grant of partial summary judgment, VACATE the award of attorney's fees, and REMAND for further proceedings consistent with this opinion.

---

[125]    (...continued)
essential service, tenant is excused from paying rent, may procure reasonable substitute housing, and may recover "the amount by which the actual and reasonable cost exceeds rent").

[126]    *See* AS 34.03.070(d) (providing that if landlord wrongfully withholds a portion of tenant's security deposit, "tenant may recover an amount not to exceed twice the actual amount withheld").